## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| JOHN DOES 1-2 and 4-10,<br><br>　　　Plaintiffs,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF MINNESOTA, ERIC KALER, AND TINA MARISAM,<br><br>　　　Defendants. | Case No. _____<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

For their Compliant against the Regents of the University of Minnesota ("University"), Eric Kaler, and Tina Marisam, the above-named Plaintiffs state and assert as follows:

### NATURE OF ACTOIN

1.　　Plaintiffs seek redress from the University and the individual Defendants for the racial and gender discrimination; intentional, willful, and malicious misconduct; and deliberate indifference Defendants exhibited in connection with the University's investigation of allegations of sexual misconduct against Plaintiffs and the disciplinary proceedings and punishments that followed. Defendants' conduct deprived Plaintiffs of the most basic due process and equal protection rights and was the product of intentional discrimination based on Plaintiffs' race and gender, retaliation against Plaintiffs for exercising their Constitutional rights. Defendants willfully and maliciously at disparaged Plaintiffs and used them as scapegoats to appease federal authorities and deflect public

1

scrutiny over the University's and Eric Kaler's historic lack of vigilance against sexual harassment by white males in the University Athletics Department.

2.      Each Plaintiff is an African American male. At all relevant times, Plaintiffs were students at the University and members of its football team. All Plaintiffs with the exception of JD1 were under contractual scholarships that provided them with significant financial benefits in exchange for participation in the University football team.

3.      On September 2, 2016, following the team's first victory of the season, five of the plaintiffs engaged in consensual sex with Jane Doe, a white female member of the University's Spirit Squad. Jane Doe's mother, however, later reported it to police as a sexual assault.

4.      Trained investigators from the Minneapolis Police Department's Special Investigation Unit thoroughly investigated Jane Doe's allegations. Based on the evidence gathered during the police investigation, the Hennepin County Attorney declined to press any charges against the five Plaintiffs accused of sexual misconduct.

5.      The events of September 2, 2016 were also reported to the University's Office of Equal Opportunity and Affirmative Action ("EOAA"). Unlike the police investigation, the EOAA's investigation focused on finding the accused men guilty of sexual misconduct in order to validate the EOAA's previously expressed, biased belief that male football players had a propensity for sexually assaulting and harassing women. Having failed to substantiate that belief in past investigations, the EOAA's investigation of Jane Doe's allegations was bent on finding sexual misconduct by as many male football players as possible.

2

6.      Because of Plaintiffs' gender, and to support an archaic assumption that male football players had a propensity for sexual misconduct against women, the EOAA investigators deprived Plaintiffs of the fair and impartial investigation to which they were entitled under the U.S. Constitution and University policies and procedures. Among other things, to support its predetermined conclusions, EOAA investigators ignored and excused significant inconsistencies in Jane Doe's story, allowed Jane Doe to repeatedly change her narrative, failed to advise certain Plaintiffs that they had been accused of sexual misconduct, ignored exculpatory evidence, failed to interview critical witnesses, and mischaracterized what Plaintiffs and other witnesses said during their interviews in order to create purported "inconsistencies" between Plaintiffs' factual accounts: Defendants similarly exercised a per se bias in failing to investigate or even mention Jane Doe's own violations of the Student Conduct Code.

7.      Incredibly, at the end of the investigation, the EOAA determined that nine African American football players – the original five that were the subject of the police investigation and an additional four whom Jane Doe had not previously accused – engaged in sexual misconduct warranting suspension or expulsion from the University. It also recommended probation for a tenth African American male student.

8.      The University and administrators at its highest levels, including University President Eric Kaler, were complicit in victimizing Plaintiffs by utilizing the EOAA's overzealous and discriminatory investigation in order to deflect criticism the University was facing for having previously turned a blind eye to charges of sexual harassment by white men in the University Athletics Department. At the time the EOAA was

3

investigating the September 2 events, the University was already under scrutiny for its mishandling of several high-profile instances of sexual harassment of women by white male administrators or coaches in the Athletics Department. Those instances lead to public criticism of the University and President Kaler and to a Title IX investigation by the U.S. Department of Education's Office of Civil Rights.

9.     To quell public criticism and appease federal investigators concerned over the University's past transgressions, the University and Kaler discriminated against Plaintiffs because of their gender by not only allowing, but by actively facilitating, the EOAA's biased investigation and the University's subsequent unwarranted punishment of Plaintiffs. Rather than ensure Plaintiffs received the fair and impartial process, immediately upon the issuance of the EOAA's findings, the University suspended all ten accused Plaintiffs from the football team. In the following days and weeks, Kaler tried to convict Plaintiffs in the court of public opinion and prejudice Plaintiffs' ability to receive a fair and impartial hearing on the EOAA's charges by making public statements portraying Plaintiffs as guilty of the alleged violations of the Student Conduct Code. Among other statements, Kaler told the University community and the public that Plaintiffs' conduct was contrary to the University "institutional values," that the punishment was "based on facts," that the University's sexual assault training "didn't seem to make the point" with these players, and that Kaler was "standing up for victims of sexual violence." During the hearing and appeals that followed, the University and its leaders continued to take actions that deprived Plaintiffs of any semblance of a fair and impartial process.

10.     Race discrimination also played a central role in the University's use of Plaintiffs as scapegoats to atone for its past transgressions. The prior instances of sexual misconduct by Athletics Department administrators and coaches involved perpetrators who were white. In those instances, the University and Kaler took a dramatically different approach, expressing sympathy for their situation, making excuses for their conduct, and agreeing to compromise resolutions that allowed the perpetrators to resign their positions with promises of significant additional compensation. The University's and Kaler's reaction to the EOAA's investigation of the African American Plaintiffs was markedly different. For the Plaintiffs, there were no public expressions of sympathy or offer of a so-called "golden parachute". Instead, as set forth above, Plaintiffs were immediately condemned by the University and Kaler, who publicly labeled all the Plaintiffs guilty of sexual misconduct without affording them any ability to contest the EOAA's charges. Five Plaintiffs were then punished with expulsion or suspension without a fair and impartial hearing. The only distinguishing feature between Plaintiffs and the accused Athletics Department officials and coaches whom the University and Kaler had treated with sympathy and compassion was the color of their skin.

11.     Plaintiffs have suffered severe damage as a result of the Defendants' actions.  Five of the Plaintiffs were improperly expelled or suspended from the University and have been deprived of a college education, their contractual scholarship rights, and their right to participate in intercollegiate athletics without due process or equal protection of the law.  All Plaintiffs, including those who were able to prevail in the disciplinary process despite Defendants' efforts, were greatly damaged by being falsely

5

cast as sex offenders, a very public stigma they will never be able to escape. As a result of Defendants' conduct, Plaintiffs have had their reputations forever tarnished, have been deprived of their property and liberty without due process or equal protection, and have suffered severe emotional distress and financial damages. By this lawsuit, Plaintiffs seek redress for the harm they suffered as a result of Defendants' discrimination and tortious conduct.

## PARTIES

**A.    Plaintiffs.**

1.    The identity of each Plaintiff has been disclosed under separate cover to Defendants.

2.    At all relevant times, John Does 1-11 ("JD1"-"JD11") were full-time students of the University of Minnesota Twin Cities Campus. At all relevant times, John Does 1-11 were student athletes and members of the University of Minnesota Men's Football Team.

**B.    Defendants.**

3.    The Board of Regents of the University of Minnesota ("University") is a public institution of higher education created by charter and perpetuated by the Constitution of the State of Minnesota, Article XIII, Section 3. The University's main offices are located in Minneapolis, Minnesota.

4.    Eric Kaler is the President of the University and is a citizen of the State of Minnesota. Mr. Kaler is sued individually and also in his official capacity as President of the University.

5.      Tina Marisam is the current Vice President and Director of the Office of

Equity Equal Opportunity and Affirmative Action for the University's Twin Cities

Campus ("EOAA") and is a citizen of the State of Minnesota. During the periods relevant

to this Complaint, Ms. Marisam was the Assistant Director for the EOAA. Ms. Marisam

is sued individually and also in her official capacity as Assistant Director of the EOAA.

## JURISDICTION

6.      This Court has Federal Question jurisdiction under 28 U.S.C. § 1331

because Plaintiffs' claims arise under the Constitution and laws of the United States,

including: Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.*;

Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d. *et seq.*; and the Fourteenth

Amendment to the United States Constitution and 42 U.S.C. § 1983.  This Court also has

supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367

because Plaintiffs' state law claims are so closely related to their federal law claims as to

form the same case or controversy under Article III of the United States Constitution.

7.      This Court has personal jurisdiction over the Defendants on the grounds

that the University regularly does business in Minnesota and is deemed to reside in

Minnesota; Kaler and Marisam both are citizens of and reside in Minnesota.

8.      Venue for this action properly lies in this Court pursuant to 28 U.S.C. §

1391 because Defendants are headquartered in or reside in this judicial district and a

substantial part of the events or omissions giving rise to the claims occurred in this

judicial district.

## FACTS

A.    **Events of September 2, 2016.**

9.    On the evening of September 1, 2016, Jane Doe, a white female member of the University of Minnesota Spirit Squad cheer team, messaged JD2 to find out where the football parties were happening that evening. Earlier in the evening, the University football team had won its first game of the season.

10.    Jane Doe and her friends left Jane Doe's apartment around 12:30 A.M. on September 2, 2016.  After attending a Spirit Squad party, they returned to Jane Doe's apartment building and went to parties and gatherings in several different apartments. Jane Doe and a group of her friends eventually went to an apartment (hereinafter "Apartment A") where several members of the University football team lived.  There, Jane Doe began flirting with JD1 and an underage potential football recruit who was visiting campus. Jane Doe conversed with JD1 and the recruit in Apartment A until shortly after 3:05 A.M.

11.    Jane Doe then left Apartment A with JD1 and the recruit to go to JD1's apartment (hereinafter "Apartment B"), which was in the same building. Jane Doe's friends later told police investigators that they assumed Jane Doe left to have sex with the men because of the way she had been flirting with them.

B.    **Jane Doe Initiated Consensual Sex with Five of the Plaintiffs.**

12.    JD1's apartment was a large apartment with four bedrooms and a separate kitchen and living room. Four members of the University football team lived in the apartment, and the apartment served as a frequent "hang-out" area for members of the football team.

13.     Upon entering Apartment B, Jane Doe, the recruit, and JD1 went into JD1's bedroom and Jane Doe began talking with the men about having a "threesome." The three then began removing their clothes, and Jane Doe pulled down JD1's pants and initiated oral sex with JD1 while, at the same time, the recruit had vaginal sex with Jane Doe.

14.     JD1 used his cell phone to video this encounter. This video would later prove important to police investigators who concluded that it showed Jane Doe, JD1, and the recruit engaging in "what could only be considered consensual sex." The video also confirms that Jane Doe was aware the encounter was being video recorded.

15.     Soon thereafter, Jane Doe indicated that it was difficult to have sex with both men at once. JD1 then left the room, and Jane Doe continued to have sex with the underage recruit.

16.     After the recruit left, JD1 re-entered the bedroom, and began having a conversation with Jane Doe. During this time another football player, JD2, who also lived in Apartment B, entered JD1's bedroom and began talking with Jane Doe about how they had "matched" on Tinder, a dating application which includes photos and limited personal information. After a few minutes, JD2 left the bedroom, and Jane Doe and JD1 were alone. At that point, Jane Doe again initiated oral sex with JD1 so he could get an erection. The two then had consensual vaginal sex.

17.     After Jane Doe and JD1 finished having sex, JD2 returned to JD1's bedroom. After a few minutes of conversation, JD2 asked Jane Doe if she also wanted to have sex with him. She said yes and asked if he had a condom. Jane Doe then initiated

oral sex with JD2. JD2 then left the bedroom to get a condom from his own bedroom. When he returned, Jane Doe was still on JD1's bed waiting for him, and the two had consensual vaginal sex.

18.     JD6 lived in a different apartment building but was in Apartment B in the early morning of September 2, visiting friends. While there, he had a short conversation with Jane Doe while she was in JD1's bedroom after she'd had sex with JD2. He left the bedroom after that conversation, and shortly thereafter left Apartment B. He had no other contact with Jane Doe.

19.     JD3 and JD4 separately went to Apartment B the morning of September 2, 2016. When JD3 arrived, JD1's bedroom door was open and JD3 saw Jane Doe talking with JD2 and JD6. JD3 went into the bedroom and joined the conversation. When JD4 arrived, he saw Jane Doe, wrapped in a blanket, talking to some of the other people in the room, including JD2 and JD3. At that time, Jane Doe was having a normal conversation with the players and was laughing. She did not appear intoxicated, scared, confused or upset. Jane Doe had her phone and was adding one of the players as a Snapchat friend. After a few minutes, most of the men then left the bedroom, leaving Jane Doe and JD3 alone.

20.     When they were alone, Jane Doe began rubbing JD3's thigh and initiated oral sex with him. After a few minutes, however, JD3 stopped Jane Doe and told her they could not continue because he did not have a condom, although the real reason was that he had a girlfriend. JD3 then left the bedroom.

21.     After JD3 left the bedroom, JD4 went back into the bedroom and began talking with Jane Doe. Jane Doe stated that she had always wanted to have sex with JD4, but he had always been with his ex-girlfriend. Jane Doe then initiated oral sex with JD4. He said he wanted to have vaginal sex, and which point Jane Doe asked if he had a condom. The two then had consensual sex.

22.     JD5 was also went to Apartment B the morning of September 2, assuming that there may be a party in that room. When he arrived at Apartment B, he saw Jane Doe through the open door of the bedroom. She was wrapped in a blanket and holding her phone. After introducing himself to Jane Doe, JD5 went to the living room and watched television. After JD4 left Apartment B, JD5 entered the bedroom and began having a conversation with Jane Doe. JD5 then asked for oral sex, and Jane Doe replied "yes" and performed oral sex on him. The two then engaged in consensual vaginal sex.  After they were finished, Jane Doe got dressed and asked JD5 to contact her.

23.     Shortly after having sex with JD5 Jane Doe left JD1's apartment, although she returned to the apartment later that morning to speak with JD1 after he texted her to make sure everything was all right.

**C.     Jane Doe Falsely Accused the Five Plaintiffs of Sexual Assault.**

24.     Later in the day on September 2, 2016, Jane Doe's mother contacted the Minneapolis Police Department to report that her daughter had been sexually assaulted but did not want to file a report with the Police.

25.      On September 3, 2016, Jane Doe's mother contacted the police again to report that her daughter was willing to speak with them. Jane Doe reported to the police

11

that she believed she may have been sexually assaulted by JD1, JD2, JD4, and JD5. During the course of the investigation that followed, the police learned from JD1 that JD3 also had sex with Jane Doe on September 2 and investigated him as well.

26.     Trained Special Victims Unit investigators from the Minneapolis Police Department thoroughly investigated Jane Doe's allegations. They interviewed Jane Doe, collected physical evidence, interviewed the accused Plaintiffs, interviewed Jane Doe's friends and other witnesses, reviewed surveillance video from the apartment building's lobby, retrieved text messages and videos from JD1's cell phone, and reviewed the results of a sexual assault exam conducted on Jane Doe on September 2. Among other conclusions, the police noted the following.

a.   Jane Doe told police investigators the sexual contact between her, JD1, and the recruit was consensual.

b.   An 8-second video of Jane Doe, JD1, and the recruit in the bedroom of Apartment B showed that Jane Doe "appears lucid, alert, somewhat playful, and fully conscious: she does not appear to be objecting to anything at this time".

c.   A 92-second video of Jane Doe, JD1, and the recruit having sex showed that "[Jane Doe] does not appear to be upset by the activity and does not indicate that she wants it to stop. [Jane Doe's] coordination appears to be normal, and the sexual encounter appears entirely consensual." Police investigators described the 92-second video as "show[ing] Jane

Doe engaged in what could only be considered consensual sexual intercourse."

    d.  Jane Doe's friends reported that Jane Doe was flirting with JD1 and the recruit in Apartment A and that when Jane Doe left, her friends assumed she was going to have sex with those men because of the way she had been flirting with them.

    e.  Jane Doe claimed her recollection of the details of her encounters with the accused men was sparse.  For example, she said she recalled having a conversation with JD2 and having oral and vagina sex with him, but she did not recall how the sex acts started. The accused Plaintiffs provided significantly more details of the encounters and confirmed that it was Jane Doe who initiated sexual contact and that all of the sex acts were entirely consensual.

    f.  Although Jane Doe initially told police there were other men who had sex with her on September 2, the police "found no evidence to support the additional participants described by Jane Doe."

27.    At the conclusion of their investigation, the police referred the case to the Hennepin County Attorney for possible prosecution. Based on the evidence, the Hennepin County Attorney declined to charge any of the accused Plaintiffs.

**D.**    **The University EOAA Conducted A Biased, Targeted Investigation.**

28.     On or about September 6, 2016, Jane Doe and her mother went to the University Spirit Squad coach with a new story, claiming Jane Doe "was gang raped by 20 guys on the football team." That coach reported the allegations to his superiors.

29.     On September 8, 2016, Jane Doe's mother contacted a University Associate Dean to report that her daughter had been sexually assaulted. The reason for her call was to ask about academic accommodations for her daughter.

30.     On September 23, 2016, Jane Doe met with EOAA investigator Tina Marisam to discuss the September 2 events.

31.     Pursuant to federal regulations implementing Title IX of the Education Amendments of 1972, the University has adopted policies and procedures for investigating claims of sexual misconduct in violation of its Student Conduct Code that expressly require a "fair and impartial" investigation. Among other protections, University procedures require that accused students are entitled to notice which must identifying the alleged violations and explaining the basis for the allegations.

32.     The EOAA's investigation regarding the September 2, 2016 events was anything but fair and impartial. Instead, it was conducted under the specter of the office's pre-existing bias against male athletes.

33.     In 2015, the EOAA and Marisam had been involved in another investigation concerning alleged sexual misconduct by University football players. That investigation yielded one charge of sexual misconduct against a single football player.

34.     According to a statement by then-Interim Athletics Director, Beth Goetz, "[a]ll of these [2015] reports were fully investigated to the extent that they could be and

the EOAA did not substantiate any sexual assault allegations." Goetz confirmed that after those full investigations, the EOAA substantiated only one allegation of sexual harassment. Marisam, however, concluded that the EOAA's inability to find evidence sufficient to charge additional male football players with sexual misconduct must have been the result of a cover-up by the football team.

35.     Presumably based on Marisam's beliefs, following Marisam's 2015 investigation, Kimberly Hewitt, then head of the EOAA, sent an email to the University Athletics Director (at the time, Norwood Teague) and President Kaler stating the EOAA believed there was a "concerning pattern" of behavior by University football players and suggesting men on the football team posed an increased risk of future acts of sexual violence or harassment against women.

36.     Against this backdrop and with this pre-existing bias against male football players, the EOAA and Marisam investigated the September 2 events with one goal in mind: to charge as many University football players as possible with sexual misconduct so as to justify the office's archaic assumption that a culture of sexual misconduct existed among male athletes on the University football team.

37.     In her initial interview with Marisam, Jane Doe gave a false narrative of her encounter with JD1, JD2, JD4 and JD5 that was significantly more detailed that the story she had told the police. Having seen the police reports, Jane Doe expanded her story to assert a false claim that JD3 also sexually assaulted her on September 2.

38.     Marisam, however, did not limit her investigation to the five Plaintiffs accused by Jane Doe and investigated by the police. She expanded the scope of her

investigation to ensnare five additional African American male football players, none of
whom had any sexual contact with Jane Doe and only one of whom even spoke to Jane
Doe on September 2, 2016. The actions and whereabouts of the additional African
American males Marisam targeted are as follows:

a.      **JD7.** JD7 lives in Apartment A. He was present in the early
morning hours of September 2, and he saw Jane Doe, JD1, and the underage
recruit conversing on the sofa before they left for JD1's apartment. Later that
morning, JD7 went to Apartment B to help find the recruit. JD7 never went into
JD1's bedroom and had no contact with Jane Doe. In her interviews with police
and her initial interviews with Marisam, Jane Doe made no accusations of
misconduct against JD7. Instead, she asked the police to contact JD7 as a potential
witness to what had taken place in Apartment A before Jane Doe left with JD1 and
the recruit. Jane Doe told the police that she did not recall JD7 being in Apartment
B. It was not until Marisam sent Jane Doe a photograph of JD7, thus insinuating
that he was involved, that Jane Doe's story changed and she stated that it was
"highly probable" that JD7 was "in the crowd" outside JD1's bedroom while Jane
Doe was having sex in the bedroom. Neither Jane Doe nor any other witness
suggested JD7 had any sexual contact with Jane Doe on September 2.

b.      **JD8**. JD8 lived in Apartment B at the time of the events in question.
He was in his bedroom for most of the early morning hours of September 2. He
did not observe anything that suggested to him that anything amiss was happening
in the apartment. Jane Doe made no mention of JD8 in her statements to the police

or in initial interviews with Marisam. However, after Marisam sent Jane Doe a photograph of JD8, insinuating that he was involved, Jane Doe "recalled" that JD8 "was the first one in 'line'" outside JD1's bedroom door. As time passed, however, Jane Doe's "recollection" changed again, and she told Marisam she did not remember anything sexual with JD8 but that she believed it was "likely" he was in Apartment B because she didn't remember meeting him anywhere else. There was no evidence suggesting that JD8 had any sexual contact with Jane Doe on September 2.

    c.    **JD10.** JD10 also lived in Apartment B at the time of the events in question. After the football game on September 1, 2016, he went to a party in a different apartment. He then returned to Apartment B, went to his own bedroom with his girlfriend, and remained there for most of the evening, only going out briefly when he heard people in the hallway. Jane Doe made no mention of JD10 in her statements to police or her initial statements to Marisam. Jane Doe claimed to recall JD10 only after Marisam sent her a photograph of JD10, insinuating he may have been involved. Even then, Jane Doe stated that she had no recollection of talking to JD10 and simply "believes that JD10 was likely there too because [she had] never met him before" and his photograph seemed familiar. Neither Jane Doe nor any other witness suggested JD10 had any sexual contact with Jane Doe on September 2.

    d.    **JD9.** JD9 lived in a different apartment building but was in Jane Doe's apartment building, visiting friends, after the football game on September 2.

He was in Apartment A earlier that morning, but he was never in Apartment B. Jane Doe did not mention JD9 in her original statements to the police or Marisam. Jane Doe only mentioned JD9 in subsequent interviews with Marisam to clarify that she "saw his picture and pulled him aside because he seemed familiar" but that she did not remember JD9 being in Apartment B. There was no evidence that JD9 had any contact with Jane Doe on September 2.

e.      **JD11**. JD11 lives in Apartment A.  He was responsible for hosting the underage recruit who was visiting campus following the September 1, 2016 football game. After the football game, JD11 and the recruit attended a party in a different room. At some point, JD11 asked a teammate to watch the recruit and returned to his room. When JD11 returned to the party, the recruit was no longer there. JD11 eventually returned to Apartment A, but neither the recruit nor Jane Doe were there at that time. JD11 later received a group message that JD1 and the recruit were having sex with a cheerleader in Apartment B, and JD11 went to Apartment B to get the recruit. The EOAA concluded that JD11 engaged in sexual harassment in violation of University Policy and the Student Conduct Code. JD11 has retained separate counsel in this matter.

f.      **JD6**

i.      As stated above, JD6 was in Apartment B, visiting friends, in the early morning hours of September 2. Although Jane Doe had mentioned him in her initial statement to police investigators, she did not accuse him of sexual misconduct in her initial statements.

ii.      Indeed, while JD6 introduced himself to Jane Doe in Apartment B the early morning hours of September 2, they spoke for only a few seconds.  JD6 then left the bedroom and shortly thereafter left Apartment B and returned to his own apartment. JD6 did not have any other contact with Jane Doe.

iii.     Contrary to her initial statements to police investigators, in her initial interviews with Marisam, Jane Doe gave a detailed narrative in which she falsely accused JD6 as having been part of a group that forcefully raped her on September 2. Indeed, it was one of Jane Doe's more detailed purported "memories" from that date. Thereafter, on or about October 7, 2016, Jane Doe filed a sworn affidavit in Hennepin County District Court in support of a petition for a harassment restraining order against JD6, in which Jane Doe again stated, under oath, that JD6 sexually assaulted her.

iv.      It soon became apparent that Jane Doe's accusations against JD6 were false. After JD6's attorney warned Jane Doe's attorney that Jane Doe's claim that JD6 had sex with her was false, Jane Doe withdrew her petition for a restraining order and admitted that JD6 had not assaulted her. Jane Doe subsequently tried to justify the false accusations to Marisam by claiming that "after thinking about it" everything she had accused JD6 of doing was actually done by JD5.

39.     Over the course of her investigation, Marisam discriminated against Plaintiffs because of their gender by conducting an investigation into Jane Doe's accusations that was designed and intended to support a predetermined conclusion that Plaintiffs were guilty of sexual misconduct. In doing so, Marisam deprived Plaintiffs of their due process and equal protection rights and denied them the benefits of the University's Title IX policies and procedures requiring a fair and impartial investigation.

40.     The discriminatory intent behind the EOAA's investigation is revealed by the favoritism Marisam showed Jane Doe throughout the investigation and the obvious bias she exhibited against the Plaintiffs:

a.      _Marisam Showed Preferential Treatment of Jane Doe_. Over the course of her investigation, Marisam interviewed Jane Doe at least six times. During those interviews, Marisam allowed Jane Doe to respond to the statements of the accused Plaintiffs and other witnesses and to revise her story accordingly. Marisam even allowed Jane Doe to review a draft of Marisam's written narrative for "accuracy." The accused male students were not treated in a similar fashion. Marisam interviewed each of the accused men only once and only for about 15 to 30 minutes each. Marisam did not record those interviews, did not afford the accused men the opportunity to review or respond to the statements of Jane Doe or other witnesses, and did not give the accused men an opportunity to confirm the accuracy of what Marisam wrote about their statements.

b.      _Marisam Interviewed Four of the Accused Male Students Without Advising Them They Were Accused of Misconduct_.  On October 11, 2016, without

advising the students they were the subject of an investigation into suspected misconduct, Marisam sent emails to JD7, JD8, JD9, and JD10 requesting interviews.  Not understanding the pretenses behind Marisam's requests, JD7, JD8, JD9, and JD10 all agreed to be interviewed. Marisam thereafter interviewed the four students under false pretenses and without advising them they were the subject of an investigation into suspected misconduct.

c.     *Marisam failed to Investigate or Charge Jane Doe's Own Violations of the Conduct Code*.  Jane Doe admitted to having sex with the prospective recruit who was a minor and was more than 48-months younger than Jane Doe. Jane Doe admitted to police that the sexual contact with the recruit was consensual on her part. Additionally, during hearings on the harassment restraining order petitions that Jane Doe brought against certain Plaintiffs, Jane Doe asserted her Fifth Amendment right against self-incrimination in order to avoid talking about her encounter with the underage recruit. Despite these facts, Marisam and the EOAA did not investigate Jane Doe's potential sexual misconduct for initiating sex with a minor who was legally unable to give consent. Additionally, while Marisam recommended that several of the Plaintiffs be punished for providing purportedly false information to her during her investigation, Marisam did not similarly recommend punishment to Jane Doe for telling Marisam a fabricated story in which she falsely accused JD6 of rape.

d.     *Marisam Failed to Contact a Critical Witness*. JD10 told Marisam that he was with his girlfriend in his bedroom in Apartment B during much of the

time Jane Doe was in JD1's bedroom. JD10's girlfriend was a hockey player for the University. Marisam sent an email to JD10's girlfriend requesting an interview but, when she didn't respond, made no further effort to contact her. In contrast, when male football players did not promptly respond to Marisam's requests for interviews, the EOAA contacted the University Athletics Department, which then contacted the male students and said their scholarships and status on the team were in jeopardy if they did not cooperate with Marisam's investigation. As a hockey player, JD10's girlfriend would have been subject to the same pressure from the Athletics Department. But the EOAA never asked the Athletics Department to compel JD10's girlfriend to respond to Marisam's interview request, and Marisam issued her findings without interviewing that critical witness.

e.    *Marisam Mislead the Plaintiffs With Her Questions.* As discussed above, Marisam concluded that JD9 provided her with false information regarding his whereabouts on September 2 and recommended that he be punished for violating the Student Conduct Code. In reality, any misstatements by JD9 were the result of confusion generated by Marisam's own questioning.  A hearing panel would later reject Marisam's finding that JD9 willfully gave false information, concluding: "After listening to the responses that you provided at the hearing, the Panel believed that the misinformation you provided to EOAA was due to your confusion as to which night was being investigated. The Panel did not believe that you willingly provided false information in an attempt to hinder the EOAA investigation."

f.   *Marisam Ignored and Excused Significant Inconsistencies and Discrepancies in Jane Doe's Story*. Marisam concluded that Jane Doe's narrative was more credible than Plaintiffs', in substantial part due to relatively minor inconsistencies in Plaintiffs' statements. In contrast, Marisam ignored or excused several severe discrepancies and inconsistencies in Jane Doe's statements.  For example:

i.     Jane Doe reported to the Police that she believed the sexual contact with JD1 and the recruit was consensual. Yet Jane Doe told Marisam that her sexual encounter with JD1 was not consensual and that the police pressured her into saying it was consensual.

ii.     Jane Doe reported to the police that she drank alcohol before visiting several on-campus parties and then drank more alcohol at those parties. She told Marisam that she drank only before she left her apartment and did not have anything to drink at the various parties she attended.

iii.     Jane Doe reported to the police that she was sexually assaulted by multiple men. She told her coach that she was gang raped by 20 football players. However, the trained police investigators "found no evidence to support the additional participants" described by Jane Doe beyond the five men who acknowledged they'd had sex with her.

iv.     In various statements, Jane Doe told Marisam that JD11 took off his shirt.  However, in later statements, Jane Doe's story changed, and she said she was not sure whether JD11 took off his clothes. At the

subsequent hearing on the EOAA's charges, Jane Doe testified that she distinctly recalled JD11's tattoo from seeing him without a shirt. In fact, JD11 has no tattoo.

      v.      As discussed above, Jane Doe initially provided a detailed accusation that JD6 forcefully raped her. Jane Doe recanted that false accusation only after JD6's counsel warned Jane Doe's counsel that Jane Doe's claim that she even had sex with JD6 was false. Marisam not only excused Jane Doe's false accusation against JD6, but in her final report Marisam inexplicably cited Jane Doe's retraction of her false accusation against JD6 after she'd been caught in that lie as evidence of Jane Doe's credibility.

    g.     *Marisam Falsified JD11's Statement.*

        i.      Upon reviewing the report, JD11 immediately stated that he had not made statements Marisam had reported he made. JD11 brought this to the attention of Marisam, yet Marisam made no effort to correct the statements. No additional statements or corrections were made after the report was leaked to the press as described below.

    h.     *Marisam Ignored and Excused Jane Doe's Deliberate Efforts to Prevent Critical Evidence from Being Considered.*

i.      In her report on her September 2 investigation, Marisam again opined that the football team conspired to conceal information from her. The bases she asserted for that conclusion were patently illegitimate.

(1)      Marisam noted that certain players had deleted text messages they received on September 2 from their phones.  But JD1 had already willingly given police access to the text messages and videos regarding the September 2 events that were on his cell phone, and Marisam herself received copies of those text messages from another football player during her investigation.

(2)      Marisam also incredulously concluded that JD6's statement that he'd wished Jane Doe hadn't remembered his name showed that Plaintiffs were conspiring to withhold evidence from her. There is a patently more obvious explanation for JD6's comment. During their brief conversation, Jane Doe told JD6 that she likely would not remember his name because she'd met so many players whose names started with the same letter. Given that Jane Doe would later falsely accused JD6 of forcefully raping her and filed a false petition for a harassment restraining order against him that lead to his suspension from the football team, JD6's wish that she hadn't remembered his name was entirely understandable and benign.

      ii.     In contrast to her contrived conclusions that the accused

Plaintiffs concealed evidence, Marisam gave little weight to the fact that

Jane Doe deliberately and intentionally prevented the EOAA from

considering critical evidence of what happened on September 2.  Jane Doe

failed to give consent for Plaintiffs to provide Marisam with a copy of the

92-second video of Jane Doe having sex with JD1 and the recruit that,

according to police investigators, showed "what could only be considered

consensual sex" and corroborated many of the details provided by JD1.

Jane Doe also failed to comply with Marisam's request that she provide the

results of the sexual assault exam that was conducted on Jane Doe on

September 2.  Notably, Jane Doe had provided that exam report to police

investigators, who did not find anything in it to support Jane Doe's

allegations that the sex was not consensual. This fact is not intended to

attack Jane Doe but to highlight that, if discrimination were not a factor, the

pursuit of justice would involve all student conduct code violations and

alleged attempts to conceal evidence, not just those alleged against African-

American males.

41.    Marisam and the EOAA sent their final report of their investigation of the

September 2 events to the University Office of Student Conduct and Academic Integrity

on or about December 7, 2016.  The one-sided findings and conclusions in that report

went far beyond what could be reasonably justified by the evidence, revealing the

EOAA's bias against Plaintiffs because of their race and gender.

a.      Finding Jane Doe more credible despite the many contradictions, inaccuracies, and flaws in her story, the EOAA report concluded that all five Plaintiffs who acknowledged having sexual contact with Jane Doe on September 2 – JD1, JD2, JD3, JD4, and JD5 – committed sexual assault or sexual harassment and recommended expulsion for those students.

b.      Despite Jane Doe's imprecise and changing statements regarding JD11, Marisam concluded that JD11 also committed sexual harassment of Jane Doe and recommended that he be suspended.

c.      Although there was no evidence that JD7, JD8, or JD10 had any contact with Jane Doe on September 2, Marisam concluded that because they had been in Apartment B, each of those students also committed sexual harassment and recommended that each be suspended. Although Marisam found insufficient evidence to show that any of those Plaintiffs had any sexual contact with Jane Doe, to make the incident seem as horrific as possible, Marisam cited Jane Doe's discredited claim that she'd had sex with multiple additional men that evening to opine that, despite the lack of any evidence, "it's possible that ____."

d.      Marisam did not find any evidence that JD9 engaged in sexual misconduct but nevertheless recommended that he be put on probation for providing false information as to whereabouts on September 2 because he had initially denied that he was in Apartment A that morning. As the disciplinary hearing, however, it would be revealed that JD9's statements regarding his whereabouts were actually the result of confusion generated by Marisam's

questions. Notably, unlike the multiple opportunities she granted Jane Doe, Marisam recommended that JD9 be punished without giving him any opportunity to confirm or correct his initial statement.

e.      After Jane Doe withdrew her false accusations of rape against JD6, Marisam found that JD6 had not violated University Policy or the Student Conduct Code. In her report, however, Marisam not only excused Jane Doe's false allegations against JD6, but she also inexplicably concluded that Jane Doe's retraction of her false allegations, after being caught in that lie, somehow showed that Jane Doe was credible.

**E.    Because of Plaintiffs' Race and Gender, the University and its Administrators Deliberately Allowed and Actively Facilitated the EOAA's Discriminatory Investigation and Charges.**

42.    In recognition of the due process rights of its students, the University has implemented specific policies and procedures the University must follow before disciplining a student for alleged violations of its Student Conduct Code or University Policy. One of the "Guiding Principles" of the University Student Conduct Code is that students charged with violating the Student Conduct Code "are entitled to due process and procedural fairness protections."

43.    In furtherance of that core principle, the Student Conduct Code guarantees that "any student or student group charged with violation of the Student Conduct Code shall have the opportunity to receive a fair hearing." With respect to charges of sexual misconduct, University policies require a "fair hearing" hearing before members of the Student Sexual Misconduct Subcommittee ("SSMS"), which is made up of University

28

faculty, academic professionals, and students who must receive training in how to adjudicate sexual misconduct charges. The SSMS hearing panel selected to decide an individual case is charged with "fairly" considering the information presented at the hearing, determining whether the Student Conduct Code has been violated and, if so, what sanctions are appropriate.

44.     The University President bears the ultimate responsibility to ensure that accused students receive a fair process from the initial report of misconduct through any hearing and appeal.

45.     In this case, rather than critically question the EOAA's facially-biased and improper investigation and conclusions regarding the September 2 events, or even give the Plaintiffs the opportunity to challenge the EOAA's conclusions though a fair hearing on those charges, the University and administrators at is highest levels, including President Kaler, immediately condemned the Plaintiffs without affording them any due process and denied them equal protection of the law and the benefits of the University policies and procedures.

46.     According to University records, the Minneapolis Police called University Athletics Director Mark Coyle on September 7, 2016, to advise that four football players had been accused of sexual assault. University records reflect that the police told Coyle that Jane Doe had admitted to them that she consented to sex with three of the accused players and that there was other evidence to contradict Jane Doe's allegations of assault.

47.     Coyle acknowledged that Jane Doe's accusations only justified suspending one of the accused players, but he nevertheless told University administrators that all accused players should be suspended "because of optics."

48.     The University immediately suspended all players being investigated by the police and lifted the suspensions only after the Hennepin County Attorney advised that no charges would be brought against those players.

49.     When the EOAA issued its final report on its investigation, Coyle, at the direction of University President Kaler, immediately suspended all 10 of the accused students from the University football team, depriving them of the opportunity to play in the post-season bowl game.

50.     Immediately after the suspensions, Kaler went outside the University's disciplinary process and tried to justify his actions by making public statements falsely portraying all of the accused Plaintiffs as guilty of sexual assault.

        a.      In a December 14, 2016 letter to University donors, Kaler falsely stated that it was the University football team coach who decided to suspend the accused Plaintiffs. Kaler then stated that "privacy rights" prevented him from providing details, but nevertheless assured the boosters that suspensions were "based on facts and on our University's values."

        b.      On December 15, 2016, in response to the University football team's announcement that it was boycotting team activities to protest the University's unfair treatment of Plaintiffs, the University released a statement reiterated that the

suspension was made "with the full support of President Eric Kaler" and "was based on facts and is reflective of the University's values."

      c.      In a December 16, 2016 statement and open letter to student-athletes, Kaler stressed that he had "worked particularly hard to increase the understanding of the members of the University community about the importance of young women feeling safe during campus life" that these values were "more important than any single athletic team" and that '[w]hen the expectations for conduct are not met, there are consequences." Although Kaler stated that the suspension of the accused Plaintiffs was "different from any conduct code," he then immediately justified the suspension by stating that "the University of Minnesota will not change our values or our code of conduct for the sake of a bowl game." Again, citing privacy laws, Kaler stated that he could not provide the details supporting the University's actions, but nevertheless stated:

> [C]ertain behavior is simply unacceptable and antithetical to our institutional values.  We support the Gopher Athletics' decision because this is much bigger than football.  It is about the values every University of Minnesota student is called on to uphold.  We make these expectations clear, and when they are not met, there are consequences.

51.      Following the announcement of the suspensions, the University football team decided to boycott the team's upcoming bowl game in protest of the lack of due process given to the men charged in the EOAA report, particularly the five Plaintiffs Marisam found had committed sexual harassment despite the fact that they were not even part of Jane Doe's original accusations. In meetings with Kaler, Coyle and members of

the University Board of Regents, Plaintiffs expressed concerns that the University was treating Plaintiffs unfairly because they were black.

52.     The boycott raised public outcry on all sides – with some faulting the University for not providing due process and others crying for the University to take a tough stance against sexual misconduct. Sensitive to this additional criticism, during his meetings with football team leaders, Kaler went outside the University's disciplinary process – and beyond any legitimate authority he had as University President – and offered a "compromise" resolution: he would lift the suspensions for the five accused Plaintiffs who didn't have sex with Jane Doe- JD7, JD8, JD9, JD10 and JD11-, if the players would admit to the accusations in the EOAA's report. Knowing the charges were false, Plaintiffs – with the support of the team – refused that offer. Instead, the team only agreed to cease the boycott when Kaler promised that Plaintiffs would receive a fair hearing.

53.     In making his "compromise" offer, Kaler used his power as a university official to attempt to illegally manipulate witness testimony against  JD1, JD2, JD3, JD4 and JD5. Kaler's actions were in no way connected to a quest for the truth, but were instead an after-the-fact attempt to insulate himself and the university from scrutiny over the lack of due process afforded to the aforementioned students.

54.     Despite his promise, in weeks after the boycott ended, Kaler again went outside the University's disciplinary processes and procedures and went to the press with comments that repeatedly and falsely portrayed Plaintiffs as being guilty of the EOAA's charges of sexual misconduct. For example:

a.    In a January 7, 2017 newspaper interview with the Minneapolis Star Tribune, Kaler stated: "There's no due process associated with athletic suspensions. You don't have a constitutional right to pay a football game. It's a privilege." Kaler went on to say that the public leak of the confidential EOAA investigation report was "helpful" because it gained public support for the University's suspension of the accused players. Kaler concluded, "[i]n this particular case, we made all the right decisions. … [W]e've stood up for victims of sexual violence.  If I get fired for standing up for victims of sexual violence, then so be it."

b.    In a January 13, 2017 interview with the St. Paul Pioneer Press, Kaler stated that although the University had increased its sexual harassment awareness training of University athletes that training "didn't' seem to make the point" with the accused players. Kaler also reiterated that, "[t]here is no due process when it comes to athletic suspensions."

55.    The immediate impact and influence of Kaler's public proclamations of the Plaintiffs' guilt was revealed in the form of presentations, demonstrations, and protests against the accused Plaintiffs and those who supported them. Members of the general student body, leaders of the student Senate, and even tenured faculty publicly echoed Kaler's condemnation of the Plaintiffs and those who had spoken out in support of Plaintiffs' due process and equal protection rights.

56.    As is their right, Plaintiffs demanded a hearing on the EOAA's charges. The hearing took place on January 26 and 27, 2017. By that time, Kaler's statements outside the

hearing process had already poisoned the well and assured the accused students would not be afforded the fair and impartial hearing to which they were entitled. Nevertheless, throughout the hearing process, Kaler and the University continued to take actions that deprived Plaintiffs of a fair and impartial hearing.

      a.     The University denied Plaintiffs' requests for separate hearings or at least for equal time to present their cases. Instead, the University General Counsel's office was given several hours to present Jane Doe's case, while each Plaintiff was given only minutes to present his defense.

      b.     The University denied Plaintiffs' request for a racially diverse Hearing Panel that would be representative of the parties. The only racial minority on the panel was a Muslim woman from Africa.

      c.     The persons ultimately assigned sit on the Hearing Panel had all received their sexual harassment training from Marisam, the same EOAA investigator whose findings and recommendations the panel was asked to review.

      d.     The University denied Plaintiffs' access to copies of communications between Kaler and Coyle and the EOAA investigators. Additionally, Kaler and Coyle refused to participate in the hearings, despite Plaintiffs' requests that they be called as witnesses.

      e.     The University denied Plaintiffs' requests that all hearing testimony be given under oath to ensure the veracity of that testimony.

      f.     The University denied Plaintiffs' request that Jane Doe and Marisam be sequestered from the hearing. Indeed, during breaks in the hearing testimony,

Jane Doe, Marisam, and the assistant University General Counsel who presented the University's case were allowed *ex parte* contact with the Hearing Panel in the hearing room, while Plaintiffs and their counsel were excluded from the room.

g.      The University denied Plaintiffs' requests that the Hearing Panel be instructed that it could draw negative inferences from Jane Doe's failure to comply with the EOAA investigator's request that she provide the results of her sexual assault exam.

h.      When the Hearing Panel stated that it had additional questions for Marisam after her initial hearing testimony, they were advised that Marisam was unavailable.

i.      Upon information and belief, based on statements made by the Panel Chair during the hearing, the University's General Counsel, Douglas Peterson, decided, and denied, each of the requests and objections Plaintiffs had presented to the Hearing Panel. In other words, in a clear conflict of interest, the rulings on Plaintiffs' requests and objections were made by the head of the same University office that was presenting the EOAA's charges on behalf of the University. Additionally, Peterson reports directly to President Kaler and, upon information and belief, made the decisions on Plaintiffs' requests and objections in conjunction with or with the knowledge and approval of President Kaler.

57.      The facts reveal that the University's and Kaler's mistreatment of Plaintiffs throughout the investigation and hearing process were acts of intentional discrimination based on Plaintiffs' gender and race.

58.     In 2011, the U.S. Department of Education issued a now infamous "Dear Colleague" letter announcing that the Department expected colleges and universities to actively investigate and discipline claims of sexual misconduct using a preponderance of the evidence standard. The Department's expectation that schools would crack down on alleged sexual offenders was coupled with a thinly-veiled threat that schools that failed to do so would be subject to investigation by the Department's Office of Civil Rights and a loss of federal funding.

59.     In the six years after it was issued, the 2011 Dear Colleague letter was heavily criticized for fostering a witch-hunt mentality that unfairly predetermined the guilt of men accused of sexual misconduct and deprived them of due process and equal protection in Title IX investigations and disciplinary proceedings. In withdrawing the 2011 mandate in 2017, the U.S. Secretary of Education recognized that the 2011 mandate "through intimidation and coercion … has clearly pushed schools to overreach."  The Secretary went on to confirm that "[a]ny school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination."

60.     As a public institution that receives significant federal funding, the University was under pressure to punish men accused of sexual assault in order to demonstrate its compliance with the 2011 federal mandate. The Defendants also had additional reasons of their own to make examples of Plaintiffs because of their gender.

61.     At the time Jane Doe reported her accusations to the EOAA, the University was reeling from several high-profile cases involving claims that the University failed to take seriously charges that male coaches and administrators within the Athletics

Department were sexually assaulting females as well as charges that the University's

Athletics Department was exhibiting systemic favoritism to male athletes. For example:

a.      In 2014, the United Sates Department of Justice Office of Civil

Rights began investigating charges that the University Athletics discriminated

against women athletes, denying them equal funding and other resources and

treating them as an afterthought. Critics, including significant University donors,

charged that the University and its then-Athletics Director, Norwood Teague,

applied "different sets of rules" for male and female athletics and spent

comparatively little time or effort on women's sports. When the investigation

became public, President Kaler defended the Athletics Department and Teague,

saying that the University welcomed the scrutiny and it was only a "small group

that is not convinced that we're doing the right thing or that [Teague] is doing the

right thing." That public support of Teague proved ill-advised.

b.      Also in 2014, a white male volunteer coach for the University

women's gymnastics team was accused of sexually harassing a female team

member. That coach was allowed to resign. His wife, the head coach of the team,

was later found to have retaliated against a University member in connection with

those allegations. In August 2014, the head coach was allowed to enter into a

"mutually agreed-upon" resignation, which, according to news reports, allowed

her to continue to receive compensation through April 2015. In announcing that

resignation, the University publicly thanked the coach for her service and wished

her well. That case lead to an investigation by the OCR of charges that the

University had been aware of the sexual harassment and allowed it to continue. According to media reports, the University has entered into a Resolution Agreement with the OCR and the University paid a settlement of $250,000 to the victimized student.

        c.      In 2015, Athletic Director Norwood Teague, who is white, resigned following reports that he sexually harassed at least two female University administrators. In his initial communications to Teague regarding the reports, Kaler expressed sympathy for Teague and excused his conduct as the result of a possible problem with alcohol:

> I am concerned that your drinking was excessive and impaired your judgment. I requested and you agreed to seek an alcohol abuse screening assessment from a qualified health care professional and share the results with me. If recommended, I expect you will take any additional actions needed to be healthy.
>
> … You are a valued member of our team, and I care for you and your success at work and in life.

Even after Teague admitted the allegations against him, Kaler continued to defend him stating:

> Norwood has acknowledged his inappropriate behavior and has expressed remorse for his actions. He has also fully cooperated in our review of this matter and in this leadership transition in Gopher Athletics. While this does not excuse the behavior, Norwood has disclosed that he is seeking alcohol counseling and assistance, and I hope those efforts will be successful. Regardless, I believe his resignation is the appropriate response.

In accepting Teague's resignation, Kaler announced that Teague would be paid his accrued leave and bonuses and offered to pay Teague a consultant fee of $285 per hour to provide assistance with the transition. In his public comments on Teague's resignation, Kaler continued to minimize Teague's culpability for the harassment stating, "I view this as the action of one man who was overserved and a series of bad events happened." Public criticism of the University's and Kaler's handling of the Teague situation was quick and harsh. As a result, Kaler was compelled to apologize for his "overserved" comments and stated that the University would not be retaining Teague as a consultant.

62.     Any hope that the University learned its lesson from the Teague situation was short lived. That same month, another high ranking Athletics Department male administrator was accused of sexual harassment of women.

63.     It was against this backdrop that the University and its highest ranking officials chose to not only turn a blind eye to Marisam's biased investigation of Plaintiffs and her predetermined conclusion of Plaintiffs' guilt, but to actively facilitate and encourage that discriminatory mistreatment of Plaintiffs. Because of Plaintiffs' gender, the University knowingly deprived Plaintiffs of their due process and equal protection rights and denied them the benefit of a fair and impartial process in order to deflect public criticism and appease federal authorities concerned about the University's track record of ignoring sexual misconduct by men in its Athletics Department.

64.     The University's mistreatment of the accused Plaintiffs was also the result of racial discrimination.

65.     In each of the above-described instances in which the University, President Kaler, and the Athletics Department turned a blind eye to incidents of sexual harassment and treated the perpetrators with kid gloves, the perpetrator was white. Yet when Plaintiffs, ten African American athletes, were accused of sexual misconduct, there were no similar expressions of sympathy or offers of a compromise resolution. Instead, the University and its highest-level administrators immediately and publicly condemned Plaintiffs' actions, calling the players' conduct antithetical to University values, suggesting that the University's sexual harassment training simply didn't sink in with those players, and stating that suspending all ten players accused in the EOAA report was necessary to protect alleged victims of sexual assault. These statements were a far cry from the statements of concern and forgiveness Kaler and the University had expressed to white coaches and administrators accused of sexual misconduct.

66.     The intentional, discriminatory motive behind the University's actions is further revealed by the fact that the University and Kaler continued to make public statements portraying the Plaintiffs as guilty of sexual misconduct and to take actions depriving them of a fair and impartial hearing even after the University football team announced it was boycotting the team's post-season bowl game out of concern that the University was treating the accused Plaintiffs' unfairly and denying them due process because they were black.

67.     There are additional facts indicating that Defendants' conduct was motivated by intentional racial discrimination.

40

a.      White students implicated in the September 2 events were treated differently.

i.      As discussed above, the EOAA did not investigate or charge Jane Doe, who is white, for her own potential violations of the Student Conduct Code that victimized an African American minor and the African American Plaintiffs.

ii.     Similarly, Jane Doe told Marisam that a white male football player was among the people who were present in Apartment B the morning of September 2, 2016 and that he may have been involved in the events that occurred there on that date. Unlike the black players whom Jane Doe had similarly accused of being in Apartment B, Marisam concluded that the white player did not violate the Student Conduct Code and recommended no punishment.

b.      The EOAA's final report of its investigation of the September 2 events was leaked to the media shortly after it was issued.  Although the information in those reports is required to be kept confidential, the University expressed little concern over the confidentiality rights of the Plaintiffs and made no effort to determine the source of the leaked information. Indeed, in one of his many pre-hearing statements condemning Plaintiffs' conduct, Kaler stated that it was "helpful" that the EOAA report was made public because it justified the University's condemnation of the Plaintiffs (ignoring, of course, that the Plaintiffs had not yet had an opportunity to contest EOAA's findings and conclusions). In

41

contrast, in 2017, an EOAA report concerning yet another instance of sexual

misconduct by a white male Athletics Department administrator was leaked to the

news media. In that instance, the University expressed outrage over the disclosure

of confidential information involving one of its white administrators and launched

an immediate investigation to try to find the source of the leak (while expressing

comparatively little concern about the allegations of sexual harassment that were

set forth in the report).

68.     As a result of the actions taken by the University and the individual

Defendants, the outcome of the disciplinary hearings against Plaintiffs was largely

preordained and, upon information and belief, was reached in collusion with University

leaders in order to placate the protesters and government authorities who were critical of

the University and Kaler's handling of previous sexual harassment claims made by

females against white males in the University Athletics Department, while

simultaneously trying to appease critics who recognized that Plaintiffs had been denied

fundamental due process and equal protection rights.

a.     The hearing panel found that all Plaintiffs who acknowledged having

sex with Jane Doe on September 2 – JD1, JD2, JD3, JD4 and JD5– committed

sexual assault or sexual harassment in violation of the Student Conduct Code and

University Policy. The appealed findings were later affirmed by the Provost.

b.     The hearing panel rejected the EOAA's findings of sexual

misconduct as to JD7, JD8, JD9 and JD11, recognizing that there was an absence

of evidence to support the EOAA's charges.

c.      The hearing panel inexplicably found JD10 guilty of sexual

harassment despite the absence of any evidence that he had any contact with Jane

Doe on September 2. Upon information and belief, the SSMS hearing panel's

initial decision that JD10 had engaged in sexual harassment was based on its

erroneous conclusion that JD10 – who admitted to having sex with his girlfriend in

Apartment B the morning of September 2 – was one of the Plaintiffs who had

sexual contact with Jane Doe.  On appeal, the provost summarily reversed the

SSMS Panel's finding of sexual harassment against JD10, finding insufficient

evidence to suggest that JD10 had any contact with Jane Doe.

**F.      Defendants' Conduct Has Severely and Irreparably Damaged Plaintiffs.**

69.      As a result of Defendants' conduct, Plaintiffs have suffered severe,

irreparable harm and damages.

70.      The five Plaintiffs who were expelled or suspended as a result of the

Defendants' wrongful conduct were deprived of their liberty interests in their reputation

and of their property rights – including their right to a college education, their scholarship

rights, and their right to participate in intercollegiate athletics – without due process.

71.      Even those Plaintiffs who ultimately prevailed following the hearing or

appeal, despite Defendants' efforts to bias that process against them, were deprived of the

right to participate in intercollegiate athletics and were deprived of their liberty interest in

their reputation without due process.

72.      Because of their race and gender, and Defendants' archaic assumptions

about African American male athletes, all Plaintiffs were discriminated against by state

actors, were denied equal protection of the law, and were deprived of the fair and

impartial investigation and hearing process the University promises to all of its students.

73.     Defendants' misconduct has caused all Plaintiffs severe and irreparable

reputational harm, resulting in Plaintiffs' mistreatment by members of the University

community and the general public that has ranged from derogatory name calling to

threats of physical violence and death, all of which have caused Plaintiffs to suffer severe

emotional distress, mental anguish, and loss of enjoyment of life, which has manifested

itself in clinically diagnosed depression, extreme anxiety, and other severe psychological

disorders.

74.     Defendants' misconduct has also caused Plaintiffs significant current and

future pecuniary damages resulting from loss of current and future educational

opportunities, loss of or interference with Plaintiffs right to participate in intercollegiate

athletics, loss of or interferences with Plaintiffs' scholarship contracts, and loss of current

and future employment and professional opportunities.

## COUNT ONE
### Violation of Title IX (20 U.S.C. § 1681, *et seq.*)
### Against the University of Minnesota

75.     Plaintiffs reassert and incorporate all paragraphs hereinabove as if fully set

forth herein.

76.     Title IX of the Education Amendments of 1972 provides, in relevant part,

that:

No person in the United States shall, on the basis of sex, be excluded from
participation in, be denied the benefits of, or be subjected to discrimination

44

under any education program or activity receiving Federal financial
assistance …

20 U.S.C. § 1681(a)

77.    A program or activity under Title IX includes all operations of a college,

university, or other postsecondary institution any part of which is extended Federal

financial assistance.

78.    During all times relevant to this action, the University received significant

Federal financial assistance and all of its operations were therefore subject to Title IX and

the regulations promulgated thereunder.

79.    Plaintiffs are members of a protected class inasmuch as each is a male

person.

80.    As set forth in detail in the foregoing statement of Facts, on the basis of

Plaintiff's sex, the University intentionally denied Plaintiffs the benefits of University

programs and activities and subjected Plaintiffs to discrimination. Among other

discriminatory acts, based on Plaintiffs' sex, the University: denied Plaintiffs the benefits

of the University's investigation and disciplinary processes and procedures; denied

Plaintiffs a fair and impartial investigation, hearing, and appeal; otherwise denied

Plaintiffs due process in the course of the University's investigation and disciplinary

proceedings; intentionally steered the investigation and disciplinary proceedings to

support a predetermined conclusion that Plaintiffs engaged in sexual misconduct; treated

Plaintiffs less favorably in the investigation and discipline than the University had treated

persons of a different sex under similar circumstances; wrongly found that certain

Plaintiffs violated University Policy or the Student Conduct Code; wrongfully denied Plaintiffs the right to attend college and participate in college athletics; wrongfully deprived Plaintiffs the rights and benefits owed them under their scholarship agreements; and disparaged Plaintiffs by making public statements that falsely portrayed Plaintiffs as guilty of sexual misconduct.

81.     In addition, as discussed in detail in the foregoing statement of Facts, when Plaintiffs exercised the right to a hearing on the EOAA's charges in accordance with University's Title IX policies and procedures, the University retaliated against Plaintiffs by, among other conduct, making public statements that falsely portrayed Plaintiffs as guilty of having committed sexual misconduct in violation of the University Conduct Code and by taking actions during the course of the SMSS hearing that were intended and designed to have an adverse impact on Plaintiffs' ability to receive a fair and impartial hearing.

82.     The University's discriminatory conduct caused Plaintiffs to suffer significant injuries and damages as set forth above. Plaintiffs are therefore entitled to an award of damages against the University in an amount to be determined at trial and to injunctive relief for those injuries for which there is no adequate remedy at law, and to prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT TWO**
**Violation of Title VI (42 U.S.C. § 2000d)**
**Against the University of Minnesota**

83.     Plaintiffs reassert and incorporate all paragraphs hereinabove as if fully set forth herein.

46

84.     Title VI of the Civil Rights Act of 1964 provides, in relevant part, that:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

42.U.S.C. § 2000d.

85.     A program or activity under Title VI includes all operations of a college, university, or other postsecondary institution any part of which is extended Federal financial assistance.

86.     The University receives significant Federal financial assistance and is therefore subject to the prohibitions of Title VI and the mandates of the regulations promulgated thereunder.

87.     Plaintiffs are members of a protected class under Title VI inasmuch as each Plaintiff is an African American person.

88.     As set forth in detail in the foregoing statement of Facts, on the basis of Plaintiff's race, the University intentionally denied Plaintiffs the benefits of University programs and activities and subjected Plaintiffs to discrimination.  Among other discriminatory acts, based on Plaintiffs' race, the University: denied Plaintiffs the benefits of the University's investigation and disciplinary processes and procedures; denied Plaintiffs a fair and impartial investigation, hearing, and appeal; otherwise denied Plaintiffs due process in the course of the University's investigation and disciplinary proceedings; intentionally steered the investigation and disciplinary proceedings to support a predetermined conclusion that Plaintiffs engaged in sexual misconduct; treated

Plaintiffs less favorably in the investigation and discipline than the University had treated persons of a different race under similar circumstances; wrongly found that certain Plaintiffs violated University Policy or the Student Conduct Code; wrongfully denied Plaintiffs the right to attend college and participate in college athletics; wrongfully deprived Plaintiffs the rights and benefits owed them under their scholarship agreements; and disparaged Plaintiffs by making public statements that falsely portrayed Plaintiffs as guilty of sexual misconduct.

89.     The University's discriminatory conduct caused Plaintiffs to suffer significant injuries and damages as set forth above. Plaintiffs are therefore entitled to an award of damages against Defendants in an amount to be determined at trial and to injunctive relief for those injuries for which there is no adequate remedy at law, and to prejudgment interest, attorney's fees, expenses, costs and disbursements.

**COUNT THREE**
**Violation of Plaintiffs' Fourteenth Amendment**
**Equal Protection Rights (42 U.S.C. § 1983)**
**Against Kaler and Marisam in their Official Capacities and Individual Capacities**

90.     Plaintiffs reassert and incorporate all paragraphs hereinabove as if fully set forth herein.

91.     The Fourteenth Amendment to the U.S. Constitution Provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

92.     Plaintiffs have a private cause of action against Kaler and Marisam in their official capacities and in their individual capacities under 42 U.S.C. § 1983, which provides:

48

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State … subjects, or causes to be subjected, any
> citizen of the United States … to the deprivation of any rights, privileges,
> or immunities secured by the Constitution and laws, shall be liable to the
> party injured in an action at law, suit in equity, or other proper
> proceeding for redress …

93.    Plaintiffs have a clearly-established right under the Fourteenth Amendment to the Constitution to equal access to a college education at the University and to enjoy the benefits and privileges afforded to students of the University free from race and sex discrimination by University administrators.

94.    Per the conduct set forth in detail in the foregoing Fact section, Kaler and Marisam, acting under color of state law via the power and authority they possessed by reason of their respective offices with the University and with knowledge of Plaintiffs' clearly-established Constitutional rights, violated those rights by discriminating against Plaintiffs based on their race and sex.

a.    Marisam discriminated against Plaintiffs by steering the EOAA investigation of Plaintiffs to support her predetermined conclusion that Plaintiffs, because of their race and sex, were guilty of the alleged misconduct. Among other actions, because of Plaintiffs' race and sex, Marisam: gave preferential treatment and opportunities to Jane Doe because of her race and sex; encouraged Jane Doe to accuse additional Plaintiffs of misconduct without any reasonable basis in fact; failed to notify certain Plaintiffs of the charges against them; mischaracterized Plaintiffs' statements in her report; mislead Plaintiffs through confusing questioning; ignored the conclusions and findings of trained investigators of the

49

Minneapolis Police Special Victims Unit; failed to interview critical witnesses or consider critical evidence; ignored or excused significant falsehoods, inconsistencies, and discrepancies in Jane Doe's testimony; made findings of guilt and recommendations of discipline that were wholly unsupported by a preponderance of the evidence; and gave false testimony at the hearing on the EOAA's charges.

b.      Because of Plaintiffs' race and sex, Kaler discriminated against Plaintiffs by knowingly and deliberately allowing and actively facilitating the EOAA's biased investigation of and charges against Plaintiffs, interfering with the hearing process in order to affect the results of that process against Plaintiffs, and otherwise failing and refusing to provide Plaintiffs with the fair and impartial investigation, hearing, and appeal process to which they were entitled under University policies and procedures. Among other actions, because of Plaintiffs' race and sex, Kaler: suspended the accused Plaintiffs from the University football team; attempted to influence and circumvent the proscribed hearing process by offering leniency and reduced sanctions for certain Plaintiffs if the Plaintiffs would admit to the misconduct charged by the EOAA; attempted to influence the outcome of the hearing process by making numerous public statements prior to the Plaintiffs' hearing that falsely portrayed Plaintiffs as guilty of the EOAA's charges; and treated Plaintiffs differently than he had treated white persons in the University Athletics Department who had been accused of sexual misconduct.

95.     Because the Constitutional right to be free from race or sex discrimination by state actors acting under color of state law is clearly established, Kaler and Marisam are not entitled to qualified immunity or other immunity for their actions.

96.     Kaler and Marisam's discriminatory conduct caused Plaintiffs to suffer significant injuries and damages as set forth herein. As against Kaler and Marisam in their individual capacity, Plaintiffs are therefore entitled to an award of damages in an amount to be determined at trial. As against Kaler and Marisam in their individual capacities, Plaintiffs are entitled to prospective injunctive relief for those injuries for which there is no adequate remedy at law, and to prejudgment interest, attorney'' fees, expenses, costs and disbursements.

**COUNT FOUR**
**Violation of Plaintiffs' Fourteenth Amendment**
**Due Process Rights (42 U.S.C. § 1983)**
**Against Kaler and Marisam in their Official Capacities and Individual Capacities**

97.     Plaintiffs reassert and incorporate all paragraphs hereinabove as if fully set forth herein.

98.     The Fourteenth Amendment to the U.S. Constitution Provides that no State shall "deprive any person of life, liberty, or property, without due process of law."

99.     Plaintiffs have a clearly-established right under the Fourteenth Amendment to substantive and procedural due process before they can be deprived of their property rights to attend college, to their scholarship contracts, and to participate in intercollegiate athletics for the University.

100.    Plaintiffs also have a clearly-established right under the Fourteenth
Amendment to substantive and procedural due process before the State can take action
that alters or extinguishes Plaintiffs' legal status in a way that deprives them of their
liberty interest in their good name, reputation, honor, and integrity.

101.    Plaintiffs have a private cause of action against Kaler and Marisam in their
official capacities and in their individual capacities under 42 U.S.C. § 1983, which
provides:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State … subjects, or causes to be subjected,
> any citizen of the United States … to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall
> be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress …

102.    Per the conduct set forth in detail in the foregoing Fact section, Kaler and
Marisam, acting under color of state law via the power and authority they possessed by
reason of their respective offices with the University and with knowledge of Plaintiffs'
clearly-established Constitutional rights, violated those rights by taking actions that
deprived Plaintiffs of the due process to which they were entitled, to wit notice and a
meaningful opportunity to be heard before an impartial decision maker.

a.  With five of the Plaintiffs, Marisam conducted her interviews, issued
findings that they had engaged in sexual harassment, and recommended
suspension from the University without having notified Plaintiffs that
they had been accused of sexual misconduct.  Based on that report,

Kaler immediately suspended those five Plaintiffs from the football team without affording them any hearing or opportunity to respond.

b.  Following the issuance of the EOAA report, and without affording Plaintiffs' the opportunity for a hearing, Kaler made numerous disparaging and defamatory public statements, falsely portraying Plaintiffs as being guilty of the alleged misconduct. As intended, those statements – by the University's highest officer and the person charged with ensuring a fair and impartial hearing – had the effect of biasing the pool of potential hearing panel members (i.e., University faculty and students)  against Plaintiffs.

c.  In the hearing that followed, Plaintiffs were denied and deprived of basic requirements of a fair or impartial process.  For example:

  i.  During the hearings on the EOAA's charges, the Hearing Panel met *ex parte* with the Assistant General Counsel who was presenting the University's case and Jane Doe while Plaintiffs and their counsel were excluded from the hearing room.

  ii.  The decision to deny or refuse Plaintiffs' requests for certain basic procedural protections at the SMSS hearing – including requests for separate hearings or an equal length of time to present their defense, requests that testimony be taken under oath, and requests that critical video evidence of the September 2 events be considered – was made, not by the Hearing Panel or the Panel Chair, but by the University

General Counsel, the head of the same office that was presenting the
University's case against Plaintiffs.

   iii.  The Hearing Panel was comprised entirely of persons who had
received their sexual misconduct training from Marisam, the same
EOAA investigator who concluded that Plaintiffs had engaged in
sexual misconduct.

   iv.  On information and belief, the hearing Panel had direct
communication with Kaler, who communicated his opinions to the
Panel and who affirmatively stated the facts required findings that
the players engaged in misconduct.

103.   Kaler and Marisam's violation of Plaintiffs' due process rights caused
Plaintiffs to suffer significant injuries and damages as set forth herein. As against Kaler
and Marisam in their individual capacites, Plaintiffs are therefore entitled to an award of
damages in an amount to be determined at trial. As against Kaler and Marisam in their
individual capacities, Plaintiffs are entitled to prospective injunctive relief for those
injuries for which there is no adequate remedy at law, and to prejudgment interest,
attorney's fees, expenses, costs and disbursements.

## COUNT FIVE
### Defamation
### Against Kaler in his Individual Capacity

104.   Plaintiffs reassert and incorporate all paragraphs hereinabove as if fully set
forth herein.

105.    Regardless of whether he acted with any discriminatory motive or intent, Kaler made numerous public comments that falsely portrayed Plaintiffs as guilty of sexual violence.

106.    These comments were false. At the time they were made, Plaintiffs had not had any opportunity for a hearing on the EOAA's charges and the "facts" had not yet been determined. Nevertheless, while conveniently hiding behind the accused students' privacy rights to refuse to disclose details, Kaler said just enough to paint all ten of the suspended Plaintiffs as rapists who posed a threat to women.  Kaler repeatedly emphasized that "the facts" showed that the Plaintiffs' actions were "simply unacceptable and antithetical to [the University's] institutional values" and violated the University's "values [and] code of conduct." Kaler then went on to state that the University's sexual harassment training didn't make the point with the players and that his actions were necessary to protect victims of sexual assault.

107.    Had Plaintiffs been afforded a fair hearing, it would have been determined that Kaler's statements were false as to all of the Plaintiffs. At the very least, Kaler's statements portraying the Plaintiffs as sexual offenders and him as the proverbial white knight charging to the rescue of their victim are undeniably false as to the five Plaintiffs found to have committed no sexual misconduct by the hearing panel or by the Provost on appeal.

108.    Kaler did not make his false statements on proper occasion or with proper motive. These statements were made outside the context of the investigation or disciplinary proceedings themselves. One of the statements was a letter to appease

boosters who had previously been critical of Kaler's actions. Two were discretionary newspaper interviews occurring well after the EOAA report was released and the University football team boycott had been resolved. There was no requirement or need for Kaler to make these statements to perform his function as University President. (Indeed, in other high-profile incidents of sexual misconduct at the University, Kaler has declined requests for interviews.) Kaler's motive in making these false statements was to use Plaintiffs as scapegoats to try to repair and restore his personal image in the wake of criticism he received from his past handling of instances of actual sexual misconduct by University administrators.

109.    Kaler's statements harmed Plaintiff's reputation and lowered their esteem in the community. Following Kaler's statements, there were numerous protests against Plaintiffs on campus. The Plaintiffs received threats of physical violence and death. Even after being exonerated of the charges of sexual misconduct, the Plaintiffs cannot escape the stigma of having been called rapists by the Kaler and have and will continue to suffer loss of educational, employment and professional opportunities.

110.    The reputational damage caused by Kaler's defamation has caused Plaintiffs to suffer present and future pecuniary damages resulting from loss of educational opportunities and loss of current and future employment and professional opportunities. It has also caused Plaintiffs to suffer severe emotional distress. Accordingly, as against Kaler acting in his individual capacity, Plaintiffs are entitled to an award of damages to compensate them for their loss and injuries in an amount to be determined at trial.

**COUNT SIX**
**Intentional Infliction of Emotional Distress**
**Against Kaler and Marisam in their Individual Capacities**

111.    Plaintiffs reassert and incorporate all paragraphs hereinabove as if fully set forth herein.

112.    In addition to making numerous public comments that falsely portrayed Plaintiffs as guilty of sexual violence, by information and belief, Kaler and Marisam conspired to leak or directed others to leak the confidential EOAA investigation.

113.    Given the extreme bias of the report, the patently untrue nature of the report, and the wide press coverage of the report, such conduct was both extreme and outrageous and had the direct result of causing severe and foreseeable emotional distress.

**COUNT SEVEN**
**Tortious Interference with Contract**
**Against Kaler and Marisam in their Individual Capacities**

114.    Plaintiffs reassert and incorporate all paragraphs hereinabove as if fully set forth herein.

115.    Plaintiffs in this matter had scholarship contracts with the university whereby each student received a direct financial benefit in exchange for their performance as student athletes on the Minnesota Men's Football Team.

116.    Kaler and Marisam were aware of these contracts as high level administrators of the University.

117.     Kaler and Marisam were further informed of the existence and terms of Plaintiffs' scholarships after the alleged misconduct and during the initial University investigation.

118.     Without justification and with insufficient information, Kaler and Marisam worked to intentionally interfere with Plaintiffs' ability to perform their contractual duties, namely to play football for the University.

119.     More specifically, Kaler and Marisam worked and eventually procured Plaintiffs' suspension, and in some cases expulsion, from team activities.

120.     Plaintiffs' suffered damages including varying financial loss resulting from the loss of scholarships with the university.

## COUNT EIGHT
### Civil Conspiracy
### Against Kaler and Marisam in their Individual Capacities

121.     Plaintiffs reassert and incorporate all paragraphs hereinabove as if fully set forth herein.

122.     On information and belief, plaintiffs allege that Kaler and Marisam met and agreed that optics and/ or student safety required a finding of misconduct.

123.     More specifically, Kaler and Marisam met and agreed to utilize the hearing and investigation required by Title IX to unlawfully discriminate against the Plaintiffs and to create the false appearance of impartiality to affirm and insulate Kaler and Marisam from public scrutiny.

124.    Kaler and Marisam thereafter violated the law by substantially limiting the Plaintiffs' rights to a fair and impartial administrative proceeding thereby assuring their predetermined outcome.

125.    Plaintiffs suffered damages, including varying financial loss resulting from the loss of scholarships with the university.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants and asks the Court to:

a.    Order injunctive relief as follows: (i) the University must immediately reinstate JD4, JD3, JD5, and JD2 as students in good standing with all rights and privileges commensurate with that status; (ii) the University must expunge from Plaintiffs' records all references to any charges or findings of sexual misconduct, together with any references of any disciplinary actions taken against any Plaintiff based on those charges or findings.

b.    As against the University and against Kaler and Marisam acting in their individual capacities, award Plaintiffs compensatory damages in an amount to be determined at trial.

c.    Award Plaintiffs their attorney's fees, disbursements, and costs pursuant to 42 U.S.C. § 1988(b) or pursuant to any other statute or common law doctrine providing for the award of attorney's fees, disbursements, and/or costs;

d.    Award Plaintiffs all interest allowed by law;

e.      Grant such other and further relief as the Court deems just and proper.


Dated: May 16, 2018                 Respectfully Submitted,

                                    MADGETT LAW, LLC

                                    By:___/s/David J.S. Madgett_____
                                    David J.S. Madgett (#0390494)
                                      619 South Tenth Street
                                      Suite 301
                                      Minneapolis, MN 55404
                                      (612) 470-6529
                                      dmadgett@madgettlaw.com

                                    ATTORNEY FOR PLAINTIFFS