# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

John Does 1-2 and 4-11,                           Civil No. 18-1596 (DWF/HB)

        Plaintiffs,

v.                                                **MEMORANDUM
                                                  OPINION AND ORDER**

Regents of the University of
Minnesota, Eric Kaler, and
Tina Marisam,

        Defendants.

_____

David J.S. Madgett, Esq., Madgett Law, LLC, counsel for Plaintiffs.

Brian J. Slovut, Esq., and Carrie Ryan Gallia, Esq., University of Minnesota, Office of the General Counsel; and Charles F. Knapp, Esq., Charles F. Webber, Esq., and Sean R. Somermeyer, Esq., Faegre Baker Daniels LLP, counsel for Defendants.

_____

## INTRODUCTION

This matter is before the Court on a Motion to Dismiss Plaintiffs' Amended Complaint brought by Defendants Regents of the University of Minnesota, Eric Kaler, and Tina Marisam (together, "Defendants"). (Doc. No. 24.) For the reasons set forth below, the Court grants the motion.

## BACKGROUND

In September 2016, University of Minnesota student Jane Doe reported to the Minneapolis Police Department ("MPD") and the University's Office of Equal Opportunity and Affirmative Action ("EOAA") that in the early morning of September 2, as many as a dozen male student-athletes on the University football team had engaged in repeated, non-consensual sexual acts with her or had watched and cheered as others engaged in those acts. (Doc. No. 22 ("Am. Compl.") ¶¶ 24, 25, 30.) Defendant Tina Marisam, the EOAA Assistant Director, met with Jane Doe and opened an investigation to determine whether any students had violated the University's Student Conduct Code (the "Code"). (*Id.* ¶ 30.)

As part of the investigation, Marisam interviewed Jane Doe and the students Jane Doe identified as having engaged in nonconsensual sexual conduct. (*Id.* ¶¶ 30, 36.) Marisam interviewed Jane Doe at least six times. (*Id.* ¶ 39.) Plaintiffs allege that Marisam interviewed each accused male student for 15 to 30 minutes. (*Id.*) Marisam's investigation included interviews with other students. (*Id.* ¶¶ 37, 39) Marisam also reviewed text messages, video, and the MPD's report of the incident. (*Id.* ¶ 39.)

In early December 2016, Marisam prepared a report and sent it to the University's Office of Student Conduct and Academic Inquiry ("OSCAI"). (*Id.* ¶ 40.) The report found it was more likely than not that certain students had violated the Code. (*Id.*) The OCSCAI offered each student a sanction to resolve the matter informally. (*Id.*)

Identifying the John Does ("JDs") numerically as numbered in the Amended Complaint, the following sanctions were offered:[1]

| Student | EOAA Findings | Proposed Sanction |
|---------|---------------|-------------------|
| JD1 | Harm to person, sexual assault, and sexual harassment | Expulsion |
| JD2 | Harm to person, sexual assault, and sexual harassment | Expulsion |
| JD3 | Harm to person, sexual assault, sexual harassment, and persistent violations | Expulsion |
| JD4 | Harm to person, sexual assault, sexual harassment, and persistent violations | Expulsion |
| JD5 | Harm to person, sexual assault, and persistent violations | Expulsion |
| JD6 | No finding | None |
| JD7 | Harm to person and sexual harassment | One-year suspension |
| JD8 | Falsification, harm to person, and sexual harassment | One-year suspension |
| JD9 | Falsification | Probation |
| JD10 | Falsification, harm to person, and sexual harassment | One-year suspension |
| JD11 | Harm to person and sexual harassment | One-year suspension |

(*Id.*)[2]  Plaintiffs allege that the findings and conclusions reveal bias against Plaintiffs because of their race and gender.  (*Id.*)

After the report was issued, the University Athletics Director Mark Coyle suspended JDs 1-5 and 7-11 from the University football team.  (*Id.* ¶ 48.)  The football

---

[1]      The Court uses the chart format offered by Defendants for ease of reference.

[2]      JD3 is not a party to this action.

team had an upcoming bowl game and, following the suspensions, the team decided to

boycott that game in protest of the lack of due process given to the men charged in the

EOAA report.  (*Id.* ¶ 50.)  Also following the suspensions, University President Eric

Kaler made several statements to the media.  (*Id.* ¶¶ 49, 53.)  Plaintiffs claim that Kaler's

statements falsely portrayed the Plaintiffs as guilty of sexual assault.  (*Id.* ¶ 49.)  The

Amended Complaint contains the following allegations with respect to Kaler's

statements:

- In a December 14, 2016 letter to University donors, Kaler falsely stated that it was the University football coach who decided to suspend the accused Plaintiffs.  Kaler then states that "privacy rights" prevented him from providing details, but nevertheless assured the boosters that suspensions were "based on facts and on our University's values."

- On December 15, 2016, in response to the University football team's announcement that it was boycotting team activities to protest the University's unfair treatment of Plaintiffs, the University released a statement reiterate[ing] that the suspension was made "with the full support of President Eric Kaler" and "was based on facts and is reflective of the University's values."

- In a December 16, 2016 statement and open letter to student-athletes, Kaler stressed that he had "worked particularly hard to increase the understanding of the members of the University community about the importance of young women feeling safe during campus life[,]" that these values were "more important than any single athletic team[,]" and that '[w]hen the expectations for conduct are not met, there are consequences."  Although Kaler stated that the suspension of the accused Plaintiffs was "different from any conduct code," he then immediately justified the suspension by stating that "the University of Minnesota will not change our values or our code of conduct for the sake of a bowl game."  Again, citing privacy laws, Kaler stated that he could not provide the details supporting the University's actions, but nevertheless stated:  [C]ertain behavior is simply unacceptable and antithetical to our institutional values.  We support the Gopher Athletics' decision because this is much bigger than football.  It is about

> the values every University of Minnesota student is called on to uphold.
> We make these expectations clear, and when they are not met, there are
> consequences.

(*Id.*)

At least one media organization obtained a copy of the redacted EOAA report and published its contents. (*Id.* ¶ 53; Doc. No. 27 ("Gallia Decl.") ¶ 3, Ex. 1 ("EOAA Report").) The boycott ended. (Am. Compl. ¶ 53.) Plaintiffs allege that, after the boycott ended, Kaler made additional statements to the press that falsely portrayed Plaintiffs as guilty of sexual misconduct and stated that "there is no due process when it comes to athletic suspensions" and "[y]ou don't have a constitutional right to play a football game." (*Id.* ¶ 53)

JDs 1-5 and 7-11 did not accept the proposed sanctions for an informal resolution. Instead, they requested a formal hearing before the University's Student Sexual Misconduct Subcommittee ("SSMS"). (*Id.* ¶ 56.) On January 26 and 27, 2017, the SSMS conducted a hearing. Plaintiffs allege that the University took actions that deprived them of a fair and impartial hearing, such as: denying their request for separate hearings; denying each Plaintiff equal time to present his defense; giving undue weight to the EOAA report; denying Plaintiffs' request for a racially diverse hearing panel; denying Plaintiffs copies of communications between Kaler and Coyle and EOAA investigators; denying requests to have Kaler and Coyle testify as witnesses; denying requests that all testimony be under oath; denying the request to sequester Jane Doe and Marisam; allowing *ex parte* contact between Jane Doe and Marisam with the hearing panel; and

declining to allow negative inferences from Jane Doe's failure to comply with the EOAA

investigator's request to provide the results of her sexual assault exam.  (*Id*. ¶ 56.)

After the SSMS hearing, the Hearing Panel issued the following decisions:

| Student | SSMS Findings | Sanction |
|---------|---------------|----------|
| JD1 | Harm to person, sexual assault, and sexual harassment | One-year suspension (reduced from expulsion) |
| JD2 | Harm to person, sexual assault, and sexual harassment | Expulsion |
| JD3 | Harm to person, sexual assault, sexual harassment, and persistent violations | Expulsion |
| JD4 | Harm to person, sexual assault, sexual harassment, and persistent violations | Expulsion |
| JD5 | Harm to person, sexual assault, and persistent violations | Expulsion |
| JD7 | Not responsible | None (reduced from one-year suspension) |
| JD8 | Not responsible | None (reduced from one-year suspension) |
| JD9 | Not responsible | None (reduced from probation) |
| JD10 | Falsification, harm to person, and sexual harassment | One-year suspension |
| JD11 | Not responsible | None (reduced from one-year suspension) |

(*Id*. ¶ 68.)

Those found responsible by the SSMS had the right to appeal to the University

Provost.  JDs 1, 3, and 10 appealed.  (*Id*.)  The Provost affirmed the Hearing Panel's

decision on JD 1 and 3, affirmed the Hearing Panel's finding that JD10 was responsible

for falsification, but reversed the finding that JD10 was responsible for harm to person

and sexual harassment.  (*Id.*)  The Provost reduced JD10's sanction to probation.  (*Id.*)
None of the Plaintiffs filed a writ of certiorari with the Minnesota Court of Appeals.

On June 8, 2018, Plaintiffs filed this action.  (Doc. No. 1.)  After Defendants filed
a motion to dismiss (Doc. No. 9), Plaintiffs amended their Complaint, asserting the
following claims:  (1) sex discrimination in violation of Title IX (against the University);
(2) racial discrimination in violation of Title VI (against the University); (3) violation of
Plaintiffs' Equal Protection Rights (against Kaler and Marisam in their official and
individual capacities); (4) violation of Plaintiff's Due Process rights (against Kaler and
Marisam in their official and individual capacities); (5) defamation (against Kaler in his
individual capacity); (6) intentional infliction of emotional distress (against Kaler and
Marisam in their individual capacities); (7) breach of contract (against the University and
asserted by JDs 2, 4-5, and 10); (8) tortious interference with contract (against Kaler and
Marisam in their individual capacities); and (9) negligence (against the University).  (Am.
Compl.)  Defendants move to dismiss all claims.

## DISCUSSION

## I.   Legal Standard

In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in
the complaint to be true and construes all reasonable inferences from those facts in the
light most favorable to the complainant.  *Morton v. Becker*, 793 F.2d 185, 187 (8th
Cir. 1986).  In doing so, however, a court need not accept as true wholly conclusory
allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th

Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).  A court deciding a motion to dismiss may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint.  *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level."  *Id.* at 555.  As the Supreme Court reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).  In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]."  *Twombly*, 550 U.S. at 556.

## II.     Title IX - Gender Discrimination and Retaliation

In Count One, Plaintiffs assert gender discrimination and retaliation claims under Title IX against the University.  Specifically, Plaintiffs allege that based on their gender, the University denied them benefits of University programs, denied them a fair disciplinary process, wrongly found that certain Plaintiffs violated University Policy or the Student Conduct Code, and made "public statements that falsely portrayed Plaintiffs as guilty of sexual misconduct."  (Am. Compl. ¶ 81.)

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Title IX is not an invitation for courts to second-guess disciplinary decisions of colleges or universities." *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 989 (D. Minn. 2017) (citing *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648-49 (1999)). Instead, Title IX should be construed to give "[s]chool administrators . . . the flexibility they require" to initiate a reasonable disciplinary response. *Id.*

Plaintiffs acknowledge that they are required to plead plausible evidence of disparate treatment to support a Title IX claim. To this end, Plaintiffs allege that the University treated them "less favorably in the investigation and discipline than the University had treated persons of a different sex under similar circumstances." (Am. Compl. ¶ 81.) In support, Plaintiffs point to allegations that when male football players did not promptly respond to interview requests, they were told that their scholarships and status on the team were in jeopardy if they did not cooperate with the investigation. (Am. Compl. ¶ 39(d).) Plaintiffs also allege that, in contrast, at least one female student who was the girlfriend of JD10 did not respond to an interview request and no further effort was made to compel her cooperation with the investigation. (*Id.*) In addition, Plaintiffs allege that EOAA personnel commenced the investigation with a preconceived belief that male football players have a heightened propensity for assaulting women. (*Id.* ¶ 6.)

Plaintiffs further allege that extreme gender bias existed because of extensive media coverage, pressure to crack down on alleged sexual offenders to demonstrate compliance with a 2011 "Dear Colleague" letter issued by the U.S. Department of Education's Office for Civil Rights ("OCR"), and an ongoing U.S. Department of Education Office of Civil Rights investigation into the University administration's failure to properly address charges of sexual harassment by white men in the Athletics Department.  (*Id.* ¶¶ 9, 58-63.)

Plaintiffs argue that evidence that the decision maker was aware of Plaintiffs' gender and acted at least in part based on their gender is sufficient to survive a motion to dismiss.  Plaintiffs further argue that they have properly alleged a Title IX claim for gender discrimination under the theories of archaic assumptions, erroneous outcome, selective enforcement, deliberate indifference, and retaliation.  *See, e.g.*, *Stenzel v. Peterson*, Civ. No. 17-580, 2017 WL 4081897, at *4 (D. Minn. Sept. 13, 2017) (recognizing standards that might govern a Title IX claim arising from a disciplinary hearing).  The Court addresses each in turn.

### 1.    Archaic Assumptions

To state a Title IX claim under the archaic-assumptions theory, Plaintiffs must assert that they were deprived of equal athletic opportunities.  *See, e.g.*, *Saravanan v. Drexel Univ.*, Civ. No. 17-3409, 2017 WL 4532243, at *7 (E.D. Pa. Oct. 10, 2017) ("[Plaintiff] does not allege [the University] denied him an equal opportunity to participate in athletic programs on the basis of his gender.  This is not a case concerning

discrimination in athletic programs.").  An archaic-assumptions claim may arise where a

student seeks "equal athletic opportunities," but encounters "classifications based upon

archaic assumptions."  *See Mallory v. Ohio Univ.*, 76 F. App'x 634, 638-39 (6th Cir.

2003).

Here, Plaintiffs argue that the archaic assumption made by the University was that

a group of male football players posed an increased risk of future acts of sexual violence

or harassment against women based on their selected sport.  (Doc. No. 31 ("Pls.' Opp'n

Mem.") at 14-15.)  In their Amended Complaint, Plaintiffs make two allegations that

reference an archaic-assumptions claim:

> Because of Plaintiffs' gender, and to support an archaic assumption that
> male football players had a propensity for sexual misconduct against
> women, the EOAA investigators deprived Plaintiffs of the fair and
> impartial investigation to which they were entitled under the U.S.
> Constitution and University policies and procedures.  Among other things,
> to support its predetermined conclusions, EOAA investigators ignored and
> excused significant inconsistencies in Jane Doe's story, allowed Jane Doe
> to repeatedly change her narrative, failed to advise certain Plaintiffs that
> they had been accused of sexual misconduct, ignored exculpatory evidence,
> failed to interview critical witnesses, overlooked Jane Doe's previous
> assertion of the Fifth Amendment, disregarded Jane Doe's signed release,
> and mischaracterized (and in some cases completely fabricated) what
> Plaintiffs and other witnesses said during their interviews in order to create
> purported "inconsistencies" between Plaintiffs' factual accounts.
> Defendants similarly exercised a per se bias in failing to investigate or even
> mention Jane Doe's own violations of the Student Conduct Code despite
> their actual knowledge and despite their legal obligation to investigate the
> violations.
>
> . . .
>
> Against this backdrop and with this pre-existing bias against male football
> players, University officials staffed Marisam to investigate the September 2
> events with one goal in mind:  to charge as many University football

> players as possible with sexual misconduct so as to justify the office's
> archaic assumption that a culture of sexual misconduct existed among male
> athletes on the University football team.

(Am. Compl. ¶¶ 7, 35.)  In addition, Plaintiffs allege that in 2015, the head of the EOAA

sent an e-mail to the University Athletics Director and University President stating the

EOAA's belief that there was a "'concerning pattern' of behavior by University football

players and suggesting boys on the football team posed an increased risk of future acts of

violence or harassment against women." (*Id.* ¶ 34.)

The Court concludes that Plaintiffs' allegations based on an archaic assumption

fail to state a Title IX claim.  First, Plaintiffs do not allege that they were denied an equal

opportunity to participate in an athletic program.  For that reason alone, this claim fails

insofar as it is based on the archaic-assumptions theory.  Moreover, the allegations of

disparate treatment are conclusory and offer no factual support for the assertion that the

EOAA was motivated by archaic assumptions about male athletes.  Finally, Plaintiffs'

reliance on the 2015 EOAA e-mail regarding a "concerning pattern" of behavior by

football players is misplaced.  Indeed, that e-mail followed an EOAA investigation that

stemmed from a complaint that multiple football players had engaged in sexual assault.

(Am. Compl. ¶ 33.)  Plaintiffs allege that the then-Interim Athletics Director stated that

the reports of sexual misconduct were "fully investigated to the extent they could be and

the EOAA did not substantiate any sexual assault allegations," but also that EEOA issued

a punishment to one player and that investigators concluded that other football players

had engaged in a "cover-up." (*Id.*)  This evidence undercuts the allegation of an archaic

assumption because any such belief about the behavior of University football players was based on a 2015 incident that led to an investigation and charge.  That the investigation did not substantiate all of the alleged misconduct does not suggest that the University made an archaic assumption about male football players in investigating Jane Doe's allegations.  For these reasons, the Court holds that Plaintiffs' Title IX claim based on an archaic assumption is properly dismissed.

### 2.   Erroneous Outcome, Selective Enforcement, and Deliberate Indifference

Plaintiffs also assert a Title IX violation under erroneous outcome, selective enforcement, and deliberate indifference theories.  Each of these theories require Plaintiffs to "plausibly allege circumstances suggesting gender bias motivated [the University's] disciplinary proceeding."  *See Univ. of St. Thomas*, 240 F. Supp. 3d at 990 (addressing erroneous-outcome[3] and deliberate-indifference claims); *Stenzel*, 2017 WL 4081897, at *4 (addressing selective-enforcement claims; explaining that to state such a claim, a plaintiff must allege circumstances suggesting gender bias motivated the disciplinary proceeding).

---

[3]    A Title IX claim based on an erroneous outcome requires Plaintiffs to show that an adverse outcome of a disciplinary proceeding was erroneous because of sex bias.  *See, e.g.*, *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016).  JDs 6 and 9 were never charged with sexual misconduct and JDs 7, 8, 9, and 11 were ultimately found "not responsible."  Therefore, these Plaintiffs cannot base their Title IX claim on an erroneous outcome of being found responsible for sexual misconduct.

In support of their erroneous-outcome theory, Plaintiffs allege that the outcome of the EOAA investigation was incorrect, relying primarily on the allegation that University officials refused to review a 92-second video that was allegedly exculpatory.  In support of their selective-enforcement claim, Plaintiffs allege that male witnesses were forced to make statements under threat to their scholarships and status on the football team while at least one female witness was not required to give a statement.  (Am. Compl. ¶ 39(d).) And in support of their deliberate-indifference theory, Plaintiffs allege that the President of the University had actual knowledge of Marisam's biased investigation, but allowed the investigation to continue because of a desire to appease federal authorities with a high-profile action against male students for sexual assault.  In addition, Plaintiffs argue that Defendants were deliberately indifferent to the "lynch mob" mentality on campus. As for the alleged discriminatory intent behind the EOAA's investigation, Plaintiffs argue that:  (1) Jane Doe was treated preferentially during the investigation; (2) Marisam interviewed four Plaintiffs without advising them that they were accused of sexual misconduct; (3) Marisam failed to investigate or charge Jane Doe's own Code violations, despite the fact that Jane Doe asserted her Fifth Amendment rights against self-incrimination in a different proceeding; (4) Marisam failed to contact a witness; (5) Marisam misled Plaintiffs with her questions; and (6) Marisam falsified JD11's statement.  (Am. Compl. ¶ 39.)

The Court finds Plaintiffs' allegations with respect to gender bias insufficient to support the above theories of a Title IX violation.  Any allegation that unbalanced

questioning favored Jane Doe as the complainant over Plaintiffs as the respondents does not suggest Plaintiffs were treated unfavorably because of their gender.  As such, any such unbalance would not be enough to demonstrate gender bias.  *See, e.g.*, *Univ. of St. Thomas*, 240 F. Supp. 3d at 991 (explaining that a bias in favor of alleged victims and against alleged perpetrators is not the equivalent of bias against male students).  In addition, the Court agrees with the majority of federal courts and finds that a general reference to federal pressure (i.e., the "Dear Colleague" letter) is insufficient to demonstrate gender bias.  *See, e.g.*, *id.* at 992.  Moreover, to allege a selective enforcement claim, Plaintiffs must identify a comparator of the opposite sex who was treated more favorably when facing similar disciplinary charges.  *See Stenzel*, 2017 WL 4081897, at *4.  Here, Plaintiffs fail to identify any similarly situated female student who faced similar disciplinary charges and was treated differently.  The comparison of the treatment of male witnesses with female witnesses is not relevant to the inquiry.

For these reasons, the Court holds that Plaintiffs' Title IX claim based on erroneous outcome, selective enforcement, or deliberate indifference is properly dismissed.

### 3.      Retaliation

Finally, Plaintiffs allege that the University retaliated against them for requesting a formal hearing and for making public comments about their conduct.  Specifically, Plaintiffs allege:

> [W]hen Plaintiffs exercised the right to a hearing on the EOAA's charges in
> accordance with University's Title IX policies and procedures, the

> University retaliated against Plaintiffs by, among other conduct, making public statements that falsely portrayed Plaintiffs as guilty of having committed sexual misconduct in violation of the University Conduct Code and by taking actions during the course of the SMSS hearing that were intended and designed to have an adverse impact on Plaintiffs' ability to receive a fair and impartial hearing.

(Am. Comp. ¶ 82.)  Plaintiffs assert that they have pled a prima facie case of retaliation by showing that they engaged in protected activity by asserting their right to a hearing and suffered an adverse action in the form of public proclamations about their guilt that "poisoned the well." (*Id.* ¶ 56.)  In addition, Plaintiffs allege that the University retaliated by denying Plaintiffs' requests for separate hearings, limiting the time for each Plaintiff to present a defense, giving the EOAA document the weight of truth, denying Plaintiffs' request for a diverse Hearing Panel, and denying Plaintiffs access to copies of certain communications between Kaler and Coyle and the EOAA investigators, among other things. (*Id.*)

Retaliation against a person because that person complained of sex discrimination is actionable under Title IX. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005).  Here, Jane Doe made a complaint of sexual assault.  Plaintiffs did not.  Plaintiffs offer no authority for the proposition that their request for a disciplinary hearing when facing allegations of sexual misconduct constitutes a "complaint of sex discrimination." Thus, Plaintiffs fail to state a claim for retaliation under Title IX.

## III.   Title VI - Racial Discrimination

In Count Two, Plaintiffs allege racial discrimination under Title VI.  (Am. Compl. ¶¶ 85-90.)  Title VI of the Civil Rights Act prohibits intentional discrimination on the

basis of race in any program that receives federal financial assistance. *See Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 794 (8th Cir. 2010).  To sufficiently plead a Title VI claim,  Plaintiffs must plead facts to show that the University acted with discriminatory animus, and may do so by identifying "a person not a member of the same allegedly protected class[] who was treated more favorably than the plaintiffs" by the University.  *See id.* at 794.  In doing so, Plaintiffs must "allege[] facts sufficient to show a fair chance of demonstrating that there are no 'mitigating or distinguishing circumstances' distinguishing [their] disciplinary case[s] from those of [their] comparators such that they are 'similarly situated in all relevant aspects.'"  *Doe v. Blake Sch.*, 310 F. Supp. 3d 969, 981 (D. Minn. 2018).  Such a showing is necessary because a Title VI claim requires a showing that race, and not some other factor, motivated intentional disparate treatment.  *Mumid*, 618 F.3d at 794.

Similar to their Title IX claim, Plaintiffs allege that the University discriminated against them on the basis of their race, both in the disciplinary process and in public statements in that the University "falsely portrayed Plaintiffs as guilty of sexual misconduct."  (Am. Compl. ¶ 89.)  Plaintiffs allege that white athletes, coaches, athletic department staff and administrators were treated differently when accused of sexual harassment or assault.  Plaintiffs argue that the appropriate comparator is any non-African American male accused of sexual assault, regardless of his role at the University.  In support, Plaintiffs point out that all members of the University community are covered by the University's sexual harassment policy.

Plaintiffs attempt to demonstrate the element of intentional discrimination by showing that the University treated similarly situated white males associated with the University who were accused of sexual harassment more favorably.  The Court, however, finds that this evidence fails as a matter of law.  In order to demonstrate discriminatory intent via the University's treatment of others, Plaintiffs must point to a comparator who is similarly situated to Plaintiffs *in all relevant respects*.  Plaintiffs have not done so. Instead, Plaintiffs broadly point to any non-African American male accused of sexual misconduct regardless of that person's role at the University.  This broad group might include student athletes, athletic staff, or administrators who were accused of sexual harassment or assault.  However, any comparison to a University employee fails because an employee is fundamentally different than a student, namely because a University employee would not be subject to the Student Conduct Code.  In addition, any comparators accused of sexual harassment would differ fundamentally from Plaintiffs who were accused of sexual assault.

Plaintiffs also point to Jane Doe as a comparator, claiming that she was treated more favorably when the University did not investigate her for Code violations.  In addition, Plaintiffs allege that the University treated a white football player who was present in the apartment during the incident more favorably when Marisam concluded he had not violated the Code and would not be sanctioned.  (Am. Compl. ¶ 67(a)(ii).) Neither of these comparators, however, are similarly situated in all relevant respects. First, no one filed a complaint against Jane Doe, let alone claimed that she had

participated in a sexual assault.  Therefore, there is no comparison to be made.  Second, as to the white football player, Plaintiffs merely allege that he "may have been involved in the events that occurred."  (*Id.*)  This allegation is not sufficient to show that he engaged in the same behavior as Plaintiffs so as to make the comparison relevant.

For the above reasons, the Court concludes that Plaintiffs have failed to state a claim under Title VI.  Therefore, Count Two is properly dismissed.

## IV.    Equal-Protection Claim

In Count Three, Plaintiffs assert a claim under the Equal Protection Clause.  To state such a claim, Plaintiffs must demonstrate that Defendants treated Plaintiffs differently than similarly situated persons.  *See Creason v. City of Washington*, 435 F.3d 820, 823 (8th Cir. 2006).  For the reasons discussed above with respect to Plaintiffs' Title VI claim for racial discrimination, Plaintiffs do not sufficiently allege that any similarly situated female or non-African American student was treated more favorably than Plaintiffs.  Again, Plaintiffs do not point to any comparator who was accused of similar conduct who was treated differently.  Thus, Plaintiffs cannot establish that they were treated differently because of their gender or race.  Therefore, Count Three is properly dismissed.

## V.    Due Process Violations

In Count Four, Plaintiffs allege that Kaler and Marisam, in their official and individual capacities, deprived Plaintiffs of their Fourteenth Amendment rights to due process.  For purposes of analyzing this claim, the Court differentiates between Plaintiffs

who were found responsible for sexual misconduct (JDs 1, 2, 4, 5, and 10[4]) and those who were found not responsible (JDs 7-11).

### A.     Exhaustion of Remedies

As a threshold matter, Defendants argue that JDs 1, 2, 4, and 5 failed to exhaust their remedies before filing the present action.  The Court agrees.  A litigant asserting a deprivation of procedural due process must exhaust state remedies before seeking relief in federal court.  *See Raymond v. Bd. of Regents of Univ. of Minn.*, 140 F. Supp. 3d 807, 818 (D. Minn. 2015) (citing *Wax'n Works v. City of St. Paul*, 213 F.3d 1016, 1019 (8th Cir. 2000)); *see also Hopkins v. City of Bloomington*, 774 F.3d 490, 492 (8th Cir. 2014).  Here, JDs 2, 4, and 5 did not appeal their adverse decision to the Provost.  Thus, their remedies were not exhausted and their due process claims are properly dismissed.  And while JD1 appealed to the Provost, neither he nor JDs 2, 4, 5 and 10, filed a petition to the Minnesota Court of Appeals for a writ of certiorari.  This petition is the exclusive remedy available to a litigant who seeks to challenge the validity of a quasi-judicial decision.  *See Zweber v. Credit River Twp.*, 882 N.W.2d 605, 609-11 (Minn. 2016); *see also Doe v. Regents of Univ. of Cal.*, 891 F.3d 1147, 1154 (9th Cir. 2018).  Because the

---

[4]     While the Provost reversed the SSMS Panel's finding of sexual harassment against JD10, the Provost found him responsible for falsification.  JD10's sanction was reduced to probation and his status as a student was not interrupted.  Therefore, Defendants argue that JD10 did not suffer a constitutional deprivation, and the Court will address JD10 in both categories of Plaintiffs.

JDs found responsible did not file a petition for a writ of certiorari with the Minnesota Court of Appeals, their due process claims are properly dismissed.

Defendants argue that they were not required to exhaust administrative remedies because they alleged pre-hearing deprivations, such as the right to participate in a post-season game, the right to safely move about campus, and the right to register for classes or obtain transcripts.  These arguments are unavailing.  First, Defendants do not cite to persuasive authority for the proposition that student-athletes have a constitutionally protected right to play in a post-season game.  In addition, while Plaintiffs generally allege that Defendants restricted Plaintiffs' ability to obtain transcripts and register for classes, there is no supporting factual allegations that, before the SSMS hearing, any Plaintiff was suspended, denied a copy of a transcript, or barred from registering from classes.  Based on the above, Plaintiffs cannot rely on alleged pre-hearing deprivations to avoid the requirement that they exhaust their administrative remedies.

For the above reasons, Count Four, insofar as it is asserted by JDs 1, 2, 4, 5 and 10, is properly dismissed.

## B.    Deprivation of a Constitutionally Protected Right

The Due Process Clause of the Fourteenth Amendment prohibits the states from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  To state a procedural due process claim, a plaintiff must demonstrate:  (1) the existence of a constitutionally protected liberty or property interest; and (2) that the defendant deprived the plaintiff of that interest without constitutionally

adequate process.  *See Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013); *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 817 (8th Cir. 2011).  In the Amended Complaint, Plaintiffs appear to assert that they have a constitutionally protected interest in (1) the asserted right to attend college; (2) their scholarship contracts; and (3) participation in intercollegiate athletics at the University.  (Am. Compl. ¶ 100.)  In addition, they allege that they were deprived of their "liberty interest in their good name, reputation, honor, and integrity."  (*Id.* ¶ 101.)

Here, JDs 7-11 were either not charged with having violated the Code or were ultimately found not responsible for sexual misconduct.  Therefore, even assuming the alleged rights are constitutionally protected, there is no plausible allegation that Plaintiffs were deprived of the ability to attend college, maintain their scholarships, or to play on the football team.  These Plaintiffs were charged with misconduct and via the investigatory process were found not to be responsible for sexual misconduct.  This defeats their due process claim.[5]

## VI.   Defamation

In Count Five, Plaintiffs assert a defamation claim against Kaler in his individual capacity.[6]  Plaintiffs allege that Kaler made various public comments that falsely

---

[5]   Because of the above ruling, the Court need not reach the issue of whether Kaler and Marisam would be entitled to qualified immunity had Plaintiffs asserted a plausible due-process claim.

[6]   Plaintiffs' arguments that Marisam, as an EOAA investigator, does not enjoy absolute privilege are irrelevant.  Plaintiffs' defamation claim is asserted only against Kaler.

portrayed Plaintiffs as guilty of sexual violence.  For example, Plaintiffs point to Kaler's

statement that Plaintiffs' conduct was contrary to the University's "institutional values,"

that the punishment was "based on facts," that the University's sexual assault training

"didn't seem to make the point" with Plaintiffs, and that Kaler was "standing up for

victims of sexual violence."  (Am. Compl. ¶ 10.)

To survive a motion to dismiss on their defamation claim, Plaintiffs must plead:

(1) a false and defamatory statement; (2) in an unprivileged publication of that statement

to a third party; and (3) harm to Plaintiffs' reputation.  *Weinberger v. Maplewood Review*,

668 N.W.2d 667, 673 (Minn. 2003); *Stepnes v. Ritschel*, 663 F.3d 952, 963 (8th Cir.

2011).  Defendants argue that the allegedly defamatory statements are privileged and,

even if they were not, the statements are either nonactionable opinion or true.

Absolute privilege is a defense to a defamation claim.  *Harlow v. State Dep't of*

*Human Servs.*, 883 N.W.2d 561, 569 (Minn. 2016).  "[A]bsolute privilege applies

without regard to the intent of the speaker, and therefore extends immunity even for

intentionally false statements."  *Id*. at 569-70 (citation and quotation omitted).  "The

holder of an absolute privilege has absolute immunity from suit for defamation."  *Bd. of*

*Regents of Univ. of Minn. v. Reid*, 522 N.W.2d 344, 346 (Minn. Ct. App. 1994).  The

Minnesota Constitution, which grants absolute immunity to members of the State Senate

and House of Representatives in the discharge of their official duties, has been extended

to members of other branches of government, including "officers of government whose

duties relate to the judicial process . . . as to statements made in the exercise of their

judicial functions." *Harlow*, 883 N.W.2d at 570.  The Minnesota Court of Appeals held that absolute privilege applied to statements by high-level officials at the University of Minnesota.  *See Bd. of Regents of Univ. of Minn.*, 522 N.W.2d at 345-47 (holding that statements of a University Senior Vice President and other officials suggesting that two professors committed civil and criminal fraud were entitled to absolute immunity); *Tofte v. Ianni*, Civ. No. 96-2613, 1997 WL 406637, at *3 (Minn. Ct. App. July 22, 1977) (holding that absolute immunity applied to statements made by the Chancellor of the University of Duluth).

Here, Kaler made the challenged statements in his official role as President of the University of Minnesota.  He spoke on the University's behalf, addressing a controversy involving allegations of a group sexual assault of a University student by several student-athletes while others watched, as well as the University's response to the allegations.  Kaler's statements came after a public outcry and the threatened boycott of an upcoming football bowl game.  Based on these facts, the Court holds that Kaler was commenting as a senior university official about a matter of significant public concern. Accordingly, absolute privilege bars Plaintiffs' defamation claim against Kaler and Count Five is dismissed.   Even if the statements were not privileged, the Court concludes that they are nonactionable opinion or true.

## VII.   Intentional Infliction of Emotional Distress

In Count Six, Plaintiffs allege a claim for intentional infliction of emotional distress (IIED).  In support, Plaintiffs assert that Kaler and Marisam made "numerous

public comments that falsely portrayed Plaintiffs as guilty of sexual violence" and "conspired to leak or directed others to leak the confidential EOAA investigation [report]".  (Am. Compl. ¶ 113.)  However, in their opposition, Plaintiffs focus on the allegation regarding the dissemination of the investigation report.  (*See* Pls.' Opp'n Mem. at 20-21.)  Plaintiffs also seek to amend their pleading should the Court incorporate the EOAA report that was attached as an exhibit to the Declaration of Carrie Ryan Gallia.[7]

To state an IIED claim, Plaintiffs must show that Kaler and Marisam's conduct was:  (1) extreme and outrageous; (2) intentional or reckless; and (3) caused emotional distress (4) that was severe.  *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438-39 (Minn. 1983).  Actionable conduct must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community."  *Id*. at 439 (citation omitted).  Moreover, the distress caused must be "so severe that no reasonable man could be expected to endure it."  *Id*. (citation omitted).

Plaintiffs' allegation that Kaler and Marisam distributed, or directed others to leak, the confidential EOAA report, is conclusory and unsupported by any factual allegations.  In addition, Plaintiffs have failed to adequately allege behavior that could be deemed "extreme and outrageous" or that they suffered severe emotional distress.  As to the latter, Plaintiffs allege generally that "all plaintiffs were subjected to unbearable harassment on campus" and that all Plaintiffs similarly have "depression, anxiety, and psychological

---

[7]     Defendants submitted a copy of the EOAA report to show that the report was partially redacted at the time it was obtained by the media and that no Plaintiff's name was revealed.

disorders." (Am. Compl. ¶¶ 72, 74.) Plaintiffs' conclusory allegations of IIED do not suffice. For this reason, Count Six is properly dismissed. *See Iqbal*, 556 U.S. at 678.

## VIII. Breach of Contract and Negligence

In Counts Seven and Nine, respectively, Plaintiffs allege breach of contract and negligence against the University. Defendants move to dismiss both claims, arguing that both are barred by the doctrine of sovereign immunity.

The Eighth Circuit Court of Appeals has held that the University of Minnesota is an agency of the State of Minnesota and is therefore immune from suit in federal court under the Eleventh Amendment. *Treleven v. Univ. of Minn.*, 73 F.3d 816, 818 (8th Cir. 1996) ("We previously have determined that the University of Minnesota is an instrumentality of the state and entitled to share in the state's Eleventh Amendment immunity."). The Eleventh Amendment provides that states and their agencies are immune from suit in federal court, unless the state has consented to be sued, or Congress has abrogated the state's immunity by some express statutory provision. *See Raymond*, 140 F. Supp. 3d at 813 (citation omitted); *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 619 (8th Cir. 1995). Plaintiff has not alleged that Congress has abrogated the Eleventh Amendment immunity with respect to breach of contract or negligence claims, and there is no indication that the University has waived its immunity and consented to be sued here.

Plaintiffs argue that whether the University has Eleventh Amendment protection must be determined on a case-by-case basis and, here, the dispositive question is whether

a judgment against the University would affect the state treasury.  Plaintiffs assert that public documents reveal that the University has become less dependent on the state in recent years and that the athletic department generates its own revenue, thus diminishing the University's invocation of sovereign immunity.  The Court is not persuaded by this argument.  As discussed above, the University is an instrumentality of the state and there is no evidence that that the University has consented to be sued in federal court on breach of contract and negligence claims.  The Court follows decisions in the Circuit holding that the University is entitled to immunity on such claims.  Counts Seven and Nine are properly dismissed.

## IX.    Tortious Interference with Contract

In Count Eight, Plaintiffs allege a claim for tortious interference with contract against Kaler and Marisam.  Relevant to this claim, Plaintiffs allege the following:

> Without justification and with insufficient information, Kaler and Marisam also worked outside the scope of their employment to intentionally interfere with Plaintiffs' ability to perform their duties, namely to play football for the University.

> More specifically, Kaler and Marisam worked and eventually procured Plaintiffs' suspension, and in some cases expulsion, from team activities by falsifying at least one statement among other activities.

(Am. Compl. at page 61-62 (¶¶ 9-10).)

To state a claim for tortious interference with a contract, Plaintiffs must allege:

(1) the existence of a contract; (2) Kaler's and Marisam's knowledge of the contract;

(3) intentional procurement of its breach; (4) without justification; and (5) damages.

*Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998).

Defendants argue that, even assuming that Plaintiffs had a contract that ensured their continued membership on the University football team, this claim fails because Kaler and Marisam were acting within the scope of their employment and, therefore, Plaintiffs' contract dispute is with the University and properly addressed via the breach of contract claim.  The Court agrees.  Even assuming a contract existed, the claim is properly dismissed.  For purposes of this claim, a party cannot interfere with its own contract.  *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 505 (Minn. 1991); *see also Cenveo Corp. v. S. Graphic Sys., Inc.*, 784 F. Supp. 2d 1130, 1139 (D. Minn. 2011).  The actions of an entity's agents in the scope of their duties for the entity are the actions of the entity itself; therefore, when an employee or other agent of the party to a contract causes a breach of that contract, the "dispute is with the company employer for breach of contract, not the agent individually for a tort."  *Nordling*, 478 N.W.2d at 505.  Tortious interference with a contract by an agent may only occur if the agent was acting outside of the scope of his or her duties.  *Id*. at 506.  Here, Plaintiffs offer only conclusory allegations that Kaler and Marisam acted outside of the scope of their duties for the University when, for example, Kaler spoke to the press.  Without factual support, these conclusory statements are not enough to state a claim for tortious interference with a contract by Kaler or Marisam.  *See Iqbal*, 556 U.S. at 679.  Moreover, it appears that the conduct at issue is plainly within the scope of Defendants' employment with the University.  Because Plaintiffs have failed to adequately plead that Kaler and Marisam were acting outside of their scope of employment, and because employees acting within

28

the scope of their duties cannot tortiously interfere with their employer's contracts, Count

Eight is properly dismissed.

## ORDER

Based on the files, records, and proceedings herein, and for the reasons stated

above, **IT IS HEREBY ORDERED** that Defendants' motion to dismiss (Doc. No. [24])

is **GRANTED** and Plaintiffs' Amended Complaint (Doc. No. [22]) is **DISMISSED**

**WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  June 24, 2019                       s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge