## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Does 1-2 and 4-11

        Plaintiff(s),

                    **PLAINTIFFS' COLLECTIVE MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS[1]**

Regents of the University of Minnesota[2]

        Defendants.

---

## <u>INTRODUCTION</u>

Title IX was passed by Congress and signed into law by President Nixon on June 23, 1972. The statute prohibits educational organizations that receive federal funds from engaging in discrimination based on sex. It begins as such: "No person…shall on the basis of sex be excluded from participation in, be denied benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. Section 1681 (a). The Does, all black male athletes, clam that the University of Minnesota ("UOFM")

---

[1] Does 2, 7 and 11 raise this motion in opposition to the University of Minnesota's memorandum in support of dismissal. In doing so, Does collectively incorporate the facts and arguments from other Plaintiff's in their motion.

[2] The UOFM files several factual affidavits that are self-serving. In particular, the affidavit of President Kaler is problematic because he refused to appear for his deposition.

was intentionally biased in Jane Doe's[3] favor during the investigation and pursued

discriminatory tactics to resolve allegations in favor of Jane Doe. The UOFM

cannot make sense of the fact that Jane Doe had two legal matters (multi-month

criminal investigation and an Order for Protection hearing (OFP) in Hennepin

County Court that were dismissed.

However, the UOFM had already implemented their scheme to discriminate

against males on the football team. The discriminatory actions were led by the

EOAA office controlled by Marisam, the University General Counsel's Office,

President Eric Kahler, and a cast of individuals who volunteered to become

panelists after being trained by Marisam and individuals from the University of

General Counsel's office on how to find male perpetrators responsible for

allegations of sexual misconduct.  The devious and improper scheme is evident in

the consistent errors made by Marasm in her investigation findings. But, according

to the UOFM, multiple sophisticated entities with their resources and checks and

balances with multiple investigators were wrong and they are right. Well, when

you control the narrative, it hard to lose.

Ultimately, the Does found themselves suspended, expelled, and lost money

in both tort and contact damages all because of an erroneous outcome at the

---

[3] Jane Doe was a female cheerleader for the athletic department who made false
accusations of sexual misconduct against the 10 Does in this lawsuit and another
10-15 phantom black males.

UOFM hearing as they failed miserably to remain neutral during the Title IX proceedings. Ultimately, the UOFM's discrimination against the male athletes arise out of there protection of federal funding after an embarrassing failure to monitor President Eric Kahler's administrative hires from a series of sexual misconduct allegations from athletic administrators protected by President Eric Kahler.

This matter comes before this court after the 8th Circuit revised the claim for gender discrimination by former UOFM Football players[4]. The district court dismissed all claims under Fed.R.Civ.P.12 (b)(6). On appeal, the Eighth Circuit revived Does' plausible claims of Title IX discrimination based on sex.

In short, the UOFM raises two issues for this court to consider in their 1,000 plus page document dump on the court.[5] Firstly, the UOFM incorrectly argues that the Does in this case do not have standing. The argument falls flat as it ignores the 8th Circuit direction to remand the case back to district court. Secondly, the UOFM believes that the material facts pertaining to gender discrimination are not disputed allowing for this Court to dismiss this high-profile case.  However, the facts are disputed regarding gender discrimination for the UOFM to avoid trial litigation.

The Does respectfully request that this Court deny UOFM's motion to dismiss and set this case for trial.

---

[4] The Does are African American males who allege that the University targeted them based on their sex and race and unfairly punished them in response to Jane Doe's accusations.
[5] The UOFM's document dump of exhibits and documents not cited in their brief should not be considered by the court. Simply put, the Court cannot be tasked with being a factfinder in this matter.

## STATEMENT OF DISPUTED FACTS

## THE INCIDENT.

After a September 2016 football game, Jane Doe[6] engaged in what was adjudicated to be consensual sex with football players including a 17-year-old recruit.  That night, Jane Doe met up with a football player and a recruit inside the Radius apartment complex. Jane Doe was filmed sitting on a couch with the football player and his recruit obviously flirting with them both. At some point, Jane Doe and the two males go upstairs to the apartment complex of Doe 1. Jane Doe, the recruit, and Doe 1 were filmed having consensual sex whereas a part of the videotape show Jane Doe asking where she can place her gum to better engage in sexual intercourse.

At that time, a Caucasian female who Marisam refused to interview saw Jane Doe when she entered the room and when she left the apartment. See Jane Doe Witness Affidavit.  The Caucasian female signed an affidavit that she heard not laughter, signs of struggle, or screams indicating sexual assault the entire night she was in the apartment.  Because this testimony would not benefit the UOFM discrimination efforts, Marisam refused to interview the female.  In contrast, Marisam identified every male in the apartment or near the apartment accusing

---

[6] Jane Doe is the accusing student.

them of sexual assault for either participating or not stopping the assault. Marisam intentionally did not assign this responsibility on the Caucasian female.

**The Criminal Investigation Dismissed Allegations.**

Eventually, Jane Doe and her mother told Minneapolis police that certain male athletes assaulted her. During this time, Jane Doe told her cheer team and coaches that she was assaulted by more than 20 plus black men. See Police Report. Due to the rule against fraternizing with athletes, the Minnesota Cheer coach suspended Jane Doe from traveling. Despite the rule, the UOFM admonished the cheer coach for suspending Jane Doe.

The Minneapolis Police initiated an investigation into only 5 black male athletes based on the information provided to them by Jane Doe. Jane Doe admitted to the police that her recollection about the event was "hazy". At this time, the police interviewed witnesses, reviewed Jane's sexual assault exam, and spoke with the accused Does. The Police continued to investigate and collected evidence from two cell phone videos of the interactions. The University was informed of the accused players and suspended them making the internal statement that the University must suspend the players "because of optics".

The Mpls police concluded that the videos depicted consensual sexual intercourse. The Mpls police presented the evidence to the Hennepin County Chief Prosecutor who ultimately declined to charge the football players with a crime. The

suspension was lifted after the announcement to decline prosecution. This really made the UOFM angry. Jane Doe falsely reported that she was intoxicated but toxicologist results showed that she had no alcohol in her system that night. Marisam deposition, pages 174-177.

## The Hennepin County Order for Protection.

After the suspensions were lifted, Jane Doe pursued an Order for Protection in Hennepin County against 6 football players. Jane Doe falsely accused Doe of having assaulted her but voluntarily dismissed him from the case because of mistaken identity resulting from his "similar sounding African American" name. Now, the accused was back down to 5 males. The OFP hearing went forward before Hennepin County Judge with Jane Doe testifying that she was assaulted by 5 males. During cross-examination, Jane Doe asserted her right against self-incrimination. Jane Doe eventually dismissed the case against the 5 players releasing them from civil liability. The UOFM counsel made commentary in open court requesting that the dismissal did not affect the EOAA's investigation.

## The EOAA Investigation and Tina Marisam's Dominating Control.

During the criminal investigation, Marisam was a key figure at the EOAA office. Marisam is a Princeton graduate with a law degree and is licensed to practice law in Minnesota. (See Tina Marisam's deposition pgs 9-10). Marisam's education is in gender and race theory with a focus on critical race theory studying

individuals of color who have been falsely accused of a crime. (See Tina Marisam's deposition pgs 10-12). Marisam admits that policies should be facially neutral and not discriminatory and agrees that policies that are facially neutral are misapplied by people in a discriminatory fashion toward people of color.  Id. at 11-12. Marisam admits to attending training where in part she learns about the Latino culture but reveals that no Latinos were involved in the presentation. Id. Marisam began her career working under Kimberly Hewitt but was promoted even though her reporting in this case was highly scrutinized. Id. Marisam was a sure lock to become the Director of the EOAA because the attorneys who represented and assisted her in this investigation had a vote in her promotion. Id. For instance, General Counsel Brian Slovut not only gave her legal advice but he voted on her promotion. Id. at 23-25.

Eventually, the Office of Equal Opportunity and Affirmative Action ("EOAA') started an internal investigation fueled by a 2015 sexual misconduct allegation that Marisam concluded the failure to corroborate the allegations was a result of false testimony from male football players. (See Tina Marisam's deposition pgs 26-29).  Regardless of any defense or evidence in the record, Marisam and the EEOA office declined to accept the facts of the investigation and unilaterally warned in an email to Athletic Director Norwood Teague and University President Eric Kahler warning them of a "concerning pattern" of

misconduct among football players which posed a risk of future sexual violence and harassment of women on campus. The email directed by Marisam and the EOAA office failed to provide evidence only making a general allegation of their unsupported conclusion of male football players' potential of future sexual violence and harassment of women on campus. Marisam and the EOAA office continued to lead investigations from women on campus despite their pre-conceived conclusions that male football players potential of future violence was inevitable.

Nonetheless, Marisam took the sole lead of investigating the allegations presented by Jane Doe on September 23, 2022. Specifically, Marisam started meeting with Jane Doe regarding her allegations. Because Jane Doe could not recall much of a detail of the incident, Marisam provided a photo lineup of male football players who lived in the alleged apartment complex to assist Jane Doe with her narrative. (Id.) Jane Doe at the direction of Marisam selected several black males. In fact, the UOFM cannot deny that one of the black males was not even in the apartment that evening. Frankly, this Doe was accused by Jane Doe because of Marisam's bias allowed for the mistaken identity. The system reveals its discriminatory conduct due to the many mistakes in the investigation findings by Marisam.

The University of Minnesota undoubtedly controlled every aspect of the investigation ensuring that the 2016 investigation would not result in a lack of conviction like in 2015. Now the record is indeed fully developed and more concerning demanding that a jury determine whether sex discrimination occurred. While the Does do not dispute that the University of Minnesota had a duty to investigate, the investigation was geared to ensure Jane Doe's narrative and convict the male students. The facts according to the Does state that the UOFM first hired experts and had their attorneys represent Doe in the University proceedings. During the investigation, Marisam engaged the football coaches and athletic administrators to tell male athletes that if they did not volunteer to meet with Marisam that they would be punished, loose their scholarship, and not eat or practice. In contrast, Marisam did not aggressively seek out a female hockey player who testified in an Affidavit that she was in the apartment the night Jane Doe alleges to have been sexually assaulted and heard or saw nothing indicating an assault Id. More importantly, Marisam only spoke to the Does (males) only once for less than 30 minutes on average about their side of the story often using false narratives and other manipulative tactics to persuade testimony from the male athletes. Even, Marisam's admis that she is biased against black males. Marisam Depo. 178:4-8.

**Marisam and UOFM Counsel Trains Panelists that Hear Cases.**

To control the process and discrimination, Marisam trained the panel tasked with evaluating her own report. Id. 217:24-218:17. Without hesitation, Marisam testified that the panel would hold her and her reports more credible because she was their trainer and the investigator or witness in these cases. Id. In fact, Marisam admits, she was likely seen as an "Expert" without laying proper foundation. Id. 218:14-222:1. This made is difficult to really defend the case.

Without question, the discovery in this case revealed new facts about how the report was created. Specifically, Jane Doe was allowed to actively participate in its drafting including selecting what information would be included. Id. 151:6-155:17. The Does were not afforded that opportunity but questioned the veracity of this government created document that was emailed to the boys and others.

Extreme bias in the investigatory process and subsequent hearing has been connected to the underlaying claim of sex discrimination under Title IX. However, many of the reporting students are female, and most accused are male, this discrimination is relevant to this matter in how the accused were selected- Namely solely based on their race and gender as articulated by the main investigator herself, Marisam. Id. 116:5-117:8.

**Marisam's Power is Limitless.**

Marisam's power is limitless as she was able to extort male witnesses to meet with her by contacting the athletic department to compel the attendance of

male witnesses. Id. 110:1-114:7. Arrogantly, Marisam admitted treating all male witnesses as possible suspects, despite having no basis to suspect the student other than gender. Id. However, the UOFM systematically excluded the male football players from the same protections it offered to female student athletes.

**President Eric Kaler Takes Sides Against the Males.**

In 2014-2015, President Kaler was on the receiving end of criticism for taking a blind eye to the sexual misconduct occurring in his own office by predators he was close friends within the athletic department. Clearly, the EOAA efforts and power allowed Kaler to clear his name, but he had to help discriminate against the males in this case.

Like Donald Trumps' DOJ investigation into his alleged efforts to rally a mob of illegal no-gooders, Kahler with the help of UOFM public relations teams made several comments in the press that "sex assault education 'didn't seem to make the point' (see Pioneer Press dated January 13, 2017). Continued press by the President helped influence bias on the committee as these statements were made before the UOFM hearing. In fact, the Does were not able to properly litigate the case.

The UOFM cannot deny that Jane Doe had 3 hours to present her case in contrast to the 20-30 minutes each Doe had to present there case. Jane Doe was

offered the UOFM office as counsel and taxpayer dollars hired experts in her case against the males. The Does requested equal funding but was denied.

**The Panel Wanted Marisam to Finish Her Testimony But She Refused.**

At the end of the panel hearings, the panel requested to hear back from Marisam.  In her report and her testimony, Marisam emphasized how important it was for the Does to cooperate in the proceedings.  However, Marisam when asked to participate in the hearing she caused to occur, she was not available because she was "too drunk" to attend. Marisam who was the center of the report and investigation refused to continue her testimony and just disappeared.  Thus, Marisam was able to make a false report, train the panel, and refused to support with testimony and be cross examined about her report. Marisam received public dollars and systematically with her acknowledged bias discriminates against black males. The UOFM simply does not care because money is motivating their desire to sidestep justice and due process.

**Damages.**

Gender discrimination cannot be argued to not crate damages for the recipient. This case was particularly upsetting due to the publicity and tort and contract damages resulting from loss contracts from the Does scholarship, attending bowl games, and losing their property interest in their athletic scholarship.

# ARGUMENT

**Legal Standard.**

Summary Judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.P.56(a). In deciding the motion, the court must make "justifiable inferences" in favor of Does version of the facts. *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 255 (1986). Therefore, a party is only entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must conclude that a genuine issue as to a fact exists "if the evidence is such that it could cause a reasonable jury to return a verdict for either party." *Rakes v. Life Investors Ins. Co. of America*, 582 F.3d 886, 893 (8th Cir. 2009). As such, this Court must "view all facts in the light most favorable to the nonmoving party and give the nonmoving party the benefit of all reasonable inferences that can be drawn from those facts." *Widoe v. Dist. #111 Otoe County Sch.*, 147 F.3d 726, 728 (8th Cir. 1998). A fact is material if its resolution affects the outcome of the case. *Rakes*, 582 at 893.

Here, Does seek adjudication regarding whether the University of Minnesota discriminated against Does based on sex when it investigated sexual misconduct allegations.

## ARGUMENT

### I.  MATERIALS FACTS EXIST PREVENTING DISMISSAL AS A MATTER OF LAW.

The document dump by the UOFM underscores the notion that material facts exist in the 1,743 pages of exhibits attached to Defendant's motion and the amended complaint in this matter was sanctioned by the Eighth Circuit to have stated plausible claims that the University engaged in sex discrimination.

The record is more developed at this stage and now Marisam admits to having unconscious bias against black males. Marisam's admission to being biased against black males along with her actions toward the males should be weighed by the jury as the ultimate fact finder. Marisam Depo. 178:4-8. Discovery has also established that the lead investigator, Marisam, influence in these actions extended further than initially alleged. Here, Marisam trained the panel tasked with evaluating her own report. Id. 217:24-218:17. Without hesitation, Marisam that the panel would hold her and her reports more credible because she was their trainer and the investigator or witness in these cases. Id. In fact, Marisam admits, she was likely seen as an "Expert" without laying proper foundation. Id. 218:14-222:1. The system however is geared that the Does were refrained from objected to this abuse of process. Clearly, the established law and proper due process is that an expert's opinion (complete with bias) can be evaluated by a trier of fact as evidence in isolation. Thus, it is a logical impossibility under such circumstances that Marisam's report

14

(containing her opinions) could be impartially evaluated under such circumstances. But, the UOFM knew this and counted on this power to influence outcomes against male students.

Without question, the discovery in this case revealed new facts about how the report was created. Specifically, Jane Doe was allowed to actively participate in its drafting including selecting what information would be included. Id. 151:6-155:17. The Does were not afforded that opportunity but questioned the veracity of this government created document that was emailed to the boys and others.

Extreme bias in the investigatory process and subsequent hearing has been connected to the underlaying claim of sex discrimination under Title IX. However, the vast majority of reporting students are female, and the vast majority of accused are male, this discrimination is relevant to this matter in how the accused were selected- Namely solely based on their race and gender as articulated by the main investigator herself, Marisam. Id. 116:5-117:8.

Marisam's power is limitless as she was able to extort male witnesses to meet with her by contacting the athletic department to compel the attendance of male witnesses. Id. 110:1-114:7. Arrogantly, Marisam admitted treating all male witnesses as possible suspects, despite having no basis to suspect the student other than gender. Id. However, the UOFM systematically excluded the male football players from the same protections it offered to female student athletes.

In their brief, the UOFM states that discrimination is OK…and the other instance of differential treatment is a distinction between the accused and an accuser. Moreover, the intention of the discrimination is a question of fact, not of law. *Sudden Valley Supply LLC Infra.* (Citing Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.). Stated otherwise, it is for the jury, not the court to determine. Id.

Here, Marisam intended to find corroborating evidence even if it meant to create it that every male present at or around the apartment was systematically classified as a suspect by based solely on gender. Male students were suspended from athletic activities and in many cases severely punished with the loss of scholarships and expulsion from the UOFM.

The culprits starting with the EOAA office created a system by assuring that males in the vicinity of an alleged sexual assault would be systematically punished without regard to fact. Stated otherwise, under the system created one was guilty by virtue of being a male. Therefore, the white Caucasian female athlete who was in the apartment during the alleged misconduct was never questioned or named a suspect or never lost time from school or athletics.

Title IX was enacted to prevent sex discrimination. Well, the UOFM motivated by federal funding found a way to cheat the system at the expense of human rights. This case is prime for a jury to decide the merits of the case.

### a. The Unconscious Bias Argument is Betrayed by Marisam's actions and failure to Mitigate.

By the UOFM's argument, there is simply nothing that can be done to avoid bias where it is not conscious and intentional. Regardless, bias is bias. But, here, the bias resulting in discrimination. The UOFM's failure is consciously knowing that they have bias will take place and doing nothing to mitigate it, intentionally allows the act to occur. Clearly, Marisam was informed that she is biased against males and was instructed to take specific remedial measures, none of which include asserting influence over panel members. Marisam Depo. 178:18-180:2. The argument that because bias is "unintentional" it is unavoidable unfairly allows bias into the process and is not the standard to negate blatant discrimination. In fact, bias conscious or otherwise can be avoided with specific remedial measures, such as independent review (a process that did not happen here given the previously noted power Marisam held over the panel).

### b. Overwhelming Testimony Shows that Does were Suspected Based Solely on Sex.

Plaintiffs each stated sentiments such as "[I] felt like the lady who interviewed me had a vendetta or something against the team" and "wanted me to get in trouble." Def. Memo. P. 13. It is a bedrock principal of our legal system that these debates as to the weight of the evidence are to be solved by the trier of fact, in this case – a jury. Not, with all due respect to your honor, a single judge with one set of life experiences and perceptions.

II. **UOFM'S Lack of Standing Argument Forces the Court to Ignore an Appellate Order.**

a. **Cummings does not prevent monetary recovery or injunctive relief in this case.**

*Cummings* does not bar recovery. *Cummings* affirmed that a federal funding recipient may be considered 'on notice that it is subject ….to remedies traditionally available in suits for breach of contract.'" *Cummings* at 1571 (Citing *Barnes v. Gorman*, 536 U.S. 181 (2002)). The case similarly affirmed that "two such remedies [are] compensatory damages and injunctions." Id. at 1571. In the operative complaint Does clearly seek recovery of such damages and the record has clearly established that such damages exist with respect to each Doe. In fact, the operative complaint in this matter contained a breach of contract claim. Except for Doe 1, all Plaintiffs in this matter were on athletic scholarships, some plaintiffs lost these scholarships. Others chose not to continue due to the impossibility created by Defendant's discrimination. With respect to Doe 1, the discovery has shown that University bared him from playing Division One football and obtaining a college education and enjoying the benefits of doing such.

The Does were on athletic scholarships that are connected to their name, image, and likeness. They have obligations to fulfill through contract which was impossible by the UOFM's improper discrimination. Above all, the UOM used

funds from student and taxpayers to pay Jane Doe $500,000. Clearly, the UOFM attorneys were conflicted out because the represented Doe at the UOFM hearing.

### b.  Does Damages are more Than Mere Emotional Distress.

Does damages are tort and contract. Does detail damages which clearly outline economic damages related to the economic loss from the denial/ delay of a college degree, from loss in standing and earnings after being branded a sex offender, from the loss of scholarships/ delay in scholarship payments, and for future medical expenses for phycological and/ or psychiatric medical services- which is clearly needed in all cases given the testimony.  Most importantly, Does also testified that they lost money from either not making it to the NFL or received a lower contract resulting from the press in this matter.

### c.  *Cummings* does not address standing.

The word "standing" is not found anywhere in the *Cummings* opinion- because the case is not about standing. Defendant's attempt to shoehorn a totally undeveloped standing argument into a summary judgment motion is inappropriate at best. At no point has any Plaintiff ever claimed he is exclusively seeking emotional distress damages. In fact, all Plaintiffs testified as to the compensable difficulties they suffered both in the fall of 2016 and into the future, all a direct result of Defendant's sex discrimination.

### <u>CONCLUSION</u>

For the reasons stated above, the UOFM's motion for summary judgment should be denied, and the Court should grant such further and other relief as deemed just and proper.

**THE HUTTON FIRM, PLLC**

Dated: November 4, 2022            */s/ Lee A. Hutton, III*            
                                   Lee A. Hutton, III (Atty No. 0327992)
                                   SPS Tower
                                   333 South Seventh Street
                                   Suite 2150
                                   Minneapolis, Minnesota 55402
                                   P: 612-805-4619
                                   E: lhutton@thehuttonfirm.com

                                   ***ATTORNEYS FOR DOES 4,7, and 11***