# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| John Does 1-2, 4-11, | Civil No. 18-1596 (DWF/TNL) |
| Plaintiffs, | |
| v. | **MEMORANDUM** |
| | **OPINION AND ORDER** |
| Regents of the University of Minnesota, | |
| Defendant. | |

David Madgett, Esq., Madgett & Klein, LLC, counsel for John Does 1, 2, 5, 6, 7, 8-10.

Jason Scott Juran, Esq., Kyle Patrick Hahn, Esq., and Lee A. Hutton, III, Esq., The Hutton Firm, PLLC, counsel for John Does 4, 11.

Anthony W. Finnell, Jr., Esq., Charles F. Knapp. Esq., and Daniel J. Connolly, Esq., Faegre Drinker Biddle & Reath LLP; Brian J. Slovut, Esq., and Carrie Ryan Gallia, University of Minnesota Office of the General Counsel; Sean R. Somermeyer, Esq., Somermeyer Sullivan PLLC, counsel for Regents of the University of Minnesota.

## INTRODUCTION

In the fall of 2016, a student at the University of Minnesota alleged that several football players engaged in repeated nonconsensual sexual acts with her or watched and cheered as others engaged in those acts. The University conducted an investigation and ten of the twelve students investigated were disciplined. The punishments ranged from probation to expulsion. Ten of the accused students, John Does 1-2 and 4-11 (collectively, "Plaintiffs"), brought suit against Defendant Regents of the University of Minnesota (the "University"). Plaintiffs asserted nine claims arising out of the investigation, including claims of race discrimination under Title VI and Section 1983,

negligence, and sex discrimination under Title IX.  All claims have been dismissed except one:  Plaintiffs' Title IX sex discrimination claim.  Plaintiffs allege that the University targeted and unfairly punished them because of their sex.  The University now moves for summary judgment.  (Doc. No. 89.)  Because Plaintiffs have failed to produce sufficient evidence of sex discrimination, the Court grants the University's motion.

## BACKGROUND

I.      **The Reporting Student's Allegations**

After the University's first football game of the season, a student, RS[1], reported that she had been sexually assaulted and harassed by multiple men on the football team. (Doc. No. 95-2 ("Report Pt. 1") at 7-16.)  RS was a Spirit Squad member and attended a Spirit Squad party after the game.  (*Id.* at 7.)  That night, RS spent time with JD1[2] and a high school football recruit, who was visiting the University of Minnesota that weekend and considering playing football at the University.  (*Id.*)  The football team invited the recruit to go out with them after the game.  (*Id.*)  Around 3:15 a.m., RS went with JD1 and the recruit to JD1's bedroom.  (*Id.* at 7-8.)

While in JD1's bedroom, RS reported that a series of men entered the room and demanded sexual acts, stating that it was their turn and telling her it would be over soon. (*Id.* at 11-12.)  RS said she became increasingly confused and repeatedly yelled, "I can't

---

[1]      Because Plaintiffs refer to themselves as "John Does," the Court refers to the reporting student as "RS," rather than Jane Doe, to avoid confusion.

[2]      The Court refers to individual Plaintiffs as "John Doe" or "JD."  For example, "John Doe 1" is the same as "JD1."

handle this many people" and "I don't want this to happen." (*Id.* at 10.)  At one point in the night, RS reported that three men "were jostling to shove their penises into [her] mouth." (*Id.* at 13.)  At times, when RS said she wanted to stop, she was told to "be quiet" or "shush." (*Id.*)  She remembered a crowd forming by the doorway and someone saying, "[Y]ou have a lot more to go." (*Id.* at 10.)  When the men left, "[t]here was a pile of around 12 used condoms on top of a white plastic set of drawers next to the television stand.  Semen was dripping down the drawers." (*Id.* at 14.)

After returning to her apartment around 4:20 a.m., RS scribbled messages on pieces of paper.  (*Id.* at 15.)  On one piece of paper, she wrote down the names of JD2, JD5, JD4, "Kalmontay or something," JD1, and "Denonte." (*Id.*)  RS then texted her friend and said that she was not sure if she had been raped.  (*Id.* at 16.)

## II.    Police Investigation

The next day, RS contacted the police.  (*Id.* at 18.)  RS reported that JD1, JD4, JD5, and the recruit each had sex with her.  (*Id.*)  She also reported that others had sex with her, but she could not remember who they were.  (*Id.*)  A few days later, RS identified A4[3] and JD2 as other men who may have had sexual contact with her.  (*Id.*) She also reported that her sexual encounter with JD1 and the recruit may have been

---

[3]    The Court refers to this student as "A4" because he is not a part of this lawsuit, and the University referred to this student as "A4" throughout the investigation.

consensual[4] but maintained that the sexual contact with the other men had not been.  (*Id.*)

RS then provided the police with an eleven-page statement about what she believed

happened in JD1's bedroom.  (*Id.*)  For the first time, RS identified JD11 as being in the

bedroom and stated that JD6 was the last man to have sex with her.  (*Id.*)

The Hennepin County Attorney's office ultimately declined to pursue criminal

charges against the accused students.

## III.    EOAA Investigation

A few weeks later, RS contacted the University's Office of Equal Opportunity and

Affirmative Action ("EOAA") and reported that she had been sexually assaulted.  (*Id.*

at 19.)  The EOAA opened an investigation and met with RS six times to piece together

what happened.  (Doc. No. 95-4 ("Marisam Dep.") at 98.)  Tina Marisam led the

investigation.  (Doc. No. 93 ("Marisam Decl.") ¶ 3.)

### A.    Reporting Student's Recollection

RS recalled having sex with the recruit, JD1, JD2, A4, JD4, and JD5.  (Report

Pt. 1 at 9.)  The EOAA found that RS's verbal reports were generally consistent with the

written account that she gave to the police but noted a few differences.  (*Id.* at 19.)  For

example, RS stated in her written account that JD11 "made [her] do the 'same thing that

A4 got,'" but she later told the EOAA that while JD11 requested the "same thing that A4

got," she could not recall whether she ultimately had sexual contact with JD11.  (*Id.*)  In

---

[4]      RS told the University that "the police led her to believe that her sexual activity
with [JD1] and the recruit was consensual because she never directly said 'no' and
because she was not held at gunpoint or under some similar threat."  (Report Pt. 1 at 18.)

addition, RS realized that she had mistakenly identified JD6 as the last person to have sex with her, when it was in fact JD5. (*Id.*)

### B.    Evidence

As part of the investigation, the EOAA reviewed a redacted version of the Minneapolis Police Department's case report. (*Id.* at 6.) The University also requested to view a ninety-second video showing RS, JD1, and the recruit engaged in sexual activity, but the Hennepin County Attorney's Office declined to share the video and other documents from the investigation. (*Id.*) The EOAA instead relied on a description of the video provided in the police report. (*Id.* at 27.)

The EOAA reviewed two other videos taken that night. (*Id.* at 6.) One video was four seconds long and showed RS, JD1, and the recruit on a couch. (*Id.*) The second video was eight seconds long and showed RS and the recruit on a bed in JD1's apartment. (*Id.*) Additionally, the EOAA obtained two photographs: one depicting the recruit, taken by JD1 and sent to first-year football players between 3:05 a.m. and 3:25 a.m., and another depicting RS, the recruit, and JD1 on a couch in a different apartment at 3:05 a.m. (*Id.* at 6-7.)

The EOAA reviewed relevant text messages. (*Id.* at 6.) Eight of the twelve accused students were part of a text message group called "the Empire," and several messages were exchanged in the group that night. (*Id.* at 19-20.) For example, at 3:17 a.m., JD1 sent a message referring to RS: "Me and the recruit finna double team

5

this bitch." (*Id.*)  JD1 later said, "I took good videos." (*Id.*)  At 4:17 a.m., JD1 sent a text stating, "Damn [JD6] all 3 them n****s hitting rn."[5] (*Id.*)

Finally, the EOAA reviewed messages between RS and JD1.  At 4:41 a.m., after RS returned to her apartment, JD1 sent RS a message, asking if she was "good." (*Id.* at 16.)  The following day, RS reached out to JD1 and asked him what had happened that night and how many men had been involved. (*Id.* at 17.)  JD1 said that he did not know how many people were in his apartment. (*Id.*)  He followed up by saying, "I know that shit was not cool I had to wash all my shit I ain't even sleep in there last night." (*Id.*)

### C. Interviews with Accused Students

Marisam interviewed each of the accused students. (*Id.* at 6.)  Initially, most Plaintiffs did not respond to the EOAA's requests to speak to them. (Doc. No. 95-5 ("JD1 Dep.") at 131; Doc. No. 95-6 ("JD2 Dep.") at 82-83; Doc. No. 95-7 ("JD4 Dep.") at 106-07; Doc. No. 95-10 ("JD7 Dep.") at 81; Doc. No. 95-11 ("JD8 Dep.") at 57; Doc. No. 95-12 ("JD9 Dep.") at 40; Doc. No. 95-14 ("JD11 Dep.") at 76.)  But when the football administrators directed Plaintiffs to schedule meetings, they then did so. (*See* JD2 Dep. at 82; JD4 Dep. at 107; JD8 Dep. at 57; JD9 Dep. at 40; JD11 Dep. at 76.)

Before the meetings, Plaintiffs were informed that they could bring counsel to the interview, and JD4 and JD6 chose to bring attorneys. (JD4 Dep. at 115; Doc. No. 95-9 ("JD6 Dep.") at 69-70.)  No Plaintiff requested a second meeting, although JD1 indicated that if he had known that the report would recommend that he be expelled, he would have

---

[5]     The Court has not fully quoted this sentence.

"asked for a couple more meetings with the EOAA."  (JD1 Dep. at 146-47; *see also* JD2 Dep. at 87; JD4 Dep. at 125-26; Doc. No. 95-8 ("JD5 Dep.") at 129; JD6 Dep. at 76; JD7 Dep. at 134; JD8 Dep. at 62; JD11 Dep. at 85.)  Additionally, JD9 reported that he thought the EOAA should have met with him a second time but noted that he did not request a second meeting.  (JD9 Dep. at 66-67,119.)

### D.    Witnesses

The EOAA interviewed sixteen witnesses.  (Report Pt. 1 at 6.)  Some of the witnesses were other football players, such as Witnesses 6, 7, and 8.  (Doc. No. 95-3 ("Report Pt. 2") at 7, 29.)  Others were friends of RS, such as Witness 5.  (*Id.* at 42.)  In addition, the EOAA attempted to interview a female hockey player, referred to as W17, who was in the apartment that night with JD10 in his bedroom.  (*Id.* at 39.)  W17 did not respond to the EOAA's two requests to meet, and Marisam did not compel W17 to meet with her.  (*Id.*; Marisam Dep. at 115.)  At Plaintiffs' request, W17 completed an affidavit which was considered during the disciplinary hearing.  (Doc. No. 99-5.)

## IV.    EOAA Conclusions and Report

The EOAA drafted an eighty-page report, detailing its findings.  All EOAA investigators reviewed the report before it was finalized.  (Marisam Decl. ¶ 9.)  The EOAA found that it was more likely than not that certain accused students violated the Student Conduct Code.  (Report Pt. 2 at 44.)  Specifically, the EOAA found evidence of sexual assault, sexual harassment, and falsification.  (*Id.*)

While each of the accused students denied engaging in any form of sexual assault, harassment, or falsification, the EOAA concluded that RS was generally more credible.

(Report Pt. 1 at 22-23.)  The EOAA considered instances where RS "reported information to [the] EOAA that did not benefit her sexual misconduct allegations."  (*Id.* at 22.)  The report also noted that, in many cases, portions of the accused students' reports corroborated RS's account.  (*Id.*)  For example, "[JD11] reported that he and six other men gathered around the bedroom doorway 'saying things' and turning on and off the lights while RS was having sex with [JD5]," which both corroborated RS's report and contradicted the reports of several other accused students.  (*Id.*)  The report found portions of the accused students' accounts credible when "they were plausible, detailed, consistent with the accounts of other credible witness and/or . . . potentially contrary to their own interest."  (*Id.* at 21.)

In addition, the report noted that RS's recollection of the events became more detailed over time but remained relatively consistent.  (*Id.* at 22.)  While RS misidentified JD6, the report found that RS was willing to admit when she remembered something incorrectly and differentiated between people that she believed may have been present with those she specifically remembered being at the apartment.  (*Id.*)  The report also noted instances where the accused students' testimony contradicted each other or changed over time.  (*See, e.g.*, *id.* at 30, 37; Report Pt. 2 at 7, 13-14, 21, 27, 32-33, 35-36, 40.)

In early December 2016, the EOAA made the following recommendations:

| Plaintiff | EOAA Finding | Proposed Sanction |
|---|---|---|
| JD1 | Harm to person, sexual assault, and sexual harassment | Expulsion |
| JD2 | Harm to person, sexual assault, and sexual harassment | Expulsion |
| JD4 | Harm to person, sexual assault, sexual harassment, and persistent violations | Expulsion |
| JD5 | Harm to person, sexual assault, and persistent violations | Expulsion |
| JD6 | No finding | None |
| JD7 | Harm to person and sexual harassment | One-year suspension |
| JD8 | Falsification, harm to person, and sexual harassment | One-year suspension |
| JD9 | Falsification | Probation |
| JD10 | Falsification, harm to person, and sexual harassment | One-year suspension |
| JD11 | Harm to person and sexual harassment | One-year suspension |

(*See* Report Pt. 2 at 44.)

## V.     SSMS Panel Hearing and Conclusions

John Does 1-2, 4-5, and 7-11 requested a hearing before the Student Sexual

Misconduct Subcommittee ("SSMS").[6]  Prior to the hearing, Plaintiffs made requests to

---

[6]     JD6 did not request a hearing because the EOAA did not find that he violated the Student Conduct Code.

(1) dismiss the SSMS hearing, (2) have separate hearings, (3) exclude the EOAA report, (4) eliminate any time restraints during the hearing, and (5) sequester RS.  (*See* Doc. No 98-10 at 4.)  The chair of the SSMS panel, Lynette Renner, ruled on the objections.  (Doc. No. 99-1.)  Renner denied Plaintiffs' request to dismiss the hearing and exclude the EOAA report.  (*Id.* at 4.)  Renner noted that "[c]ounsel may present argument and question witnesses about [what] weight, if any, to give to the report."  (*Id.*)

Renner further denied Plaintiffs' request for separate hearings, reasoning that Plaintiffs "are all alleged to have been involved in the same incident" and separate trials would mean that RS would have to testify ten separate times.  (*Id.* at 3; Doc. No. 100-3 at 32.)  Renner implemented time limits "as is allowed under the SSMS procedures."  (Doc. No. 99-1 at 4.)  Lastly, Renner denied Plaintiffs' request to sequester RS because "SSMS procedures allow the impacted person and the accused students to be in the hearing room throughout the hearing, or to listen to/view the hearing from an alternate location."  (*Id.*)

Plaintiffs also sought to admit the ninety-second video which showed RS, JD1, and the recruit engaged in sexual conduct.  (*Id.* at 5.)  Renner concluded that because neither JD1 nor the recruit were accused of engaging in nonconsensual sex with RS, the video was "irrelevant to any alleged conduct code violation at issue in the hearing."  (*Id.*)  In addition, Renner denied Plaintiffs' request to argue and present evidence that RS

violated the Student Conduct Code or criminal law[7], as such claims similarly were not relevant to Plaintiffs' alleged violations.  (*Id.*)

Three SSMS members were chosen to take part in the panel.  (Doc. No. 92 ("Renner Decl.") ¶ 7.)  The panel "consist[ed] of three voting members, at least one of whom [wa]s a student."  (*Id.*)  Prior to the SSMS hearing, Renner dismissed a panel member based on Plaintiffs' objection, as the panelist had retweeted a statement made by President Kaler.  (Doc. No. 99-3 at 2.)  The dismissed panelist was replaced by a new member.  (*Id.*)

The SSMS hearing began on January 26, 2017, and lasted two days, ending at 12:09 a.m. on January 28, 2017.  (Doc. No. 99-4 at 3-4.)  The University examined four witnesses—David Lisak, RS, W1, and Tina Marisam.  (*Id.* at 4.)  Plaintiffs were able to cross-examine each witness.  (*Id.*)  The University also submitted a number of exhibits, including "a binder of police and EOAA reports, investigative notes, text messages, letters, and University policies," as well as two short videos.  (*Id.*)  During Plaintiffs' presentation, each of the accused students testified, as did coach Tracy Claeys and a witness referred to as W12.  (*Id.*)

---

[7]    Plaintiffs argued that RS participated in child pornography because the high school football recruit was seventeen years old at the time, and RS "knowingly participated in the filming of her sexual encounter."  (Doc. No. 98-4 at 3.)  On appeal, JD1 made a similar argument that RS engaged in criminal sexual misconduct, and the Provost concluded that this argument was "entirely irrelevant, legally incorrect, and . . . highly offensive."  (Doc. No. 99-16 at 11.)

After deliberation, the panel found that JD2, JD4, and JD5 did not receive affirmative consent by RS either through words or actions and found RS's testimony to be more credible.  (Doc. No. 99-6 at 5; Doc. No. 99-7 at 5; Doc. No. 99-8 at 5.)  The panel also found that RS did not give JD1 permission to record her while they had sex and that JD1 contributed to the sexual assault through texts, comments, and FaceTime calls that he made that night.  (Doc. No. 99-4 at 5-6.)

Additionally, the panel concluded that JD10 participated in the sexual harassment, as he likely saw the group gathered outside JD1's bedroom and joined them after he escorted W17 out of the apartment.  (Doc. No. 99-12 at 6.)  The panel further concluded that JD10 provided false information during the investigation.  (*Id.*)

Lastly, the panel did not find sufficient evidence to conclude that JD7, JD8, JD9, or JD11 violated the Student Conduct Code.  The panel stated that it "believed that the misinformation [JD9] provided to EOAA was due to [his] confusion as to which night was being investigated."  (Doc. No. 99-11 at 5.)  Moreover, the panel concluded that it was possible that JD7, JD8, and JD11 "were seen by the impacted person," but the panel did not believe that they participated in any harassment taking place.  (Doc. No. 99-9 at 5; Doc. No. 99-10 at 6; Doc. No. 99-13 at 5.)

Based on these findings, the panel made the following decisions:

| Plaintiff | SSMS Finding | Panel Decision |
| --- | --- | --- |
| JD1 | Harm to person, sexual misconduct, and sexual harassment | One-year suspension |

| Plaintiff | SSMS Finding | Panel Decision |
|---|---|---|
| JD2 | Harm to person, sexual assault, and sexual harassment | Expulsion |
| JD4 | Harm to person, sexual assault, sexual harassment, and persistent violations | Expulsion |
| JD5 | Harm to person, sexual assault, and persistent violations | Expulsion |
| JD7 | Not responsible | None |
| JD8 | Not responsible | None |
| JD9 | Not responsible | None |
| JD10 | Falsification, harm to person, and sexual harassment | One-year suspension |
| JD11 | Not responsible | None |

(*See* Doc. Nos. 99-4, 99-6, 99-7, 99-8, 99-9, 99-10, 99-11, 99-12, 99-13.)

## VI.    Appeals Process

Two Plaintiffs appealed their decision to the Provost:  JD1 and JD10.  JD1 argued that the panel's decision disregarded the police report and W17's affidavit.  (Doc. No. 99-14 at 2-4.)  He also argued that his statements to police, the EOAA, and at the SMSS hearing were "entirely consistent."  (*Id.* at 2.)  After reviewing the record, the Provost rejected JD1's argument that his statements were entirely consistent.  (Doc. No. 99-16 at 6.)  The Provost also found that JD1 failed to explain how the police report supported his argument that the panel's decision was wrong and determined that the testimony of W17 was unrelated to JD1's conduct.  (*Id.* at 9.)

The Provost further concluded that evidence supported the panel's finding that JD1 contributed to the sexual assault.  (*Id.* at 10.)  JD6 testified at the hearing that JD1 said something like "you can go in and fuck if you want to," and JD2 testified that JD1 said something like "we ran her" or "she going."  (*Id.*)  The Provost concluded that a reasonable person "could interpret these statements to indicate that [] JD1 was making comments encouraging others to have sex with [RS]."  (*Id.*)  The Provost thus denied JD1's appeal.  (*Id.* at 13.)

JD10 similarly argued on appeal that the investigator failed to speak with W17, who he argued was an important witness.  (Doc. No. 99-15 at 4.)  The Provost found this argument unconvincing because JD10 did not explain how the investigator's failure to meet with W17 prejudiced him.  (Doc. No. 99-17 at 4-5.)  The Provost further noted that W17's affidavit actually contradicted JD10's assertion that he was in his bedroom with W17 the entire time RS was in the apartment, because W17 said she left at 3:48 a.m., and RS left around 4:20 a.m.  (*Id.* at 6.)

The Provost overturned the panel's sexual harassment finding, concluding that there was no evidence that JD10 observed RS having sex, and only JD11 and JD6 placed JD10 in the hallway.  (*Id.* at 6-7.)  The Provost did find, however, that JD10 was dishonest.  (*Id.* at 7.)  In the EOAA report, JD10 said he never heard a woman's voice through his bedroom wall, but during the SSMS hearing, he said he did hear a woman's voice.  (*Id.*)  Moreover, JD10 testified that he only left his room to escort W17 out of the apartment, but his testimony was contradicted by the EOAA responses of several other accused students, who reported that he was in the hallway or common areas at times

14

during the night.  (*Id.*)  The Provost affirmed the panel's falsification finding and amended JD10's sanction to probation.  (*Id.* at 8.)

No Plaintiff filed a writ of certiorari with the Minnesota Court of Appeals to challenge the University's disciplinary decisions.

## VII.   Procedural History

Plaintiffs sued the University, President Kaler, and Marisam, asserting Title IX sex discrimination, Title VI race discrimination, breach of contract, and negligence claims against the University; and equal protection, due process, defamation, intentional infliction of emotional distress, and tortious interference with contract claims against President Kaler and Marisam.  (Doc. No. 22 ("Am. Compl.").)  This Court dismissed all nine claims.  (Doc. No. 34.)  On appeal, the Eighth Circuit affirmed this Court's dismissal of eight claims but revived Plaintiffs' Title IX sex discrimination claim.  *Does 1-2 v. Regents of the Univ. of Minn.*, 999 F.3d 571, 579 (8th Cir. 2021).  Plaintiffs argue that the University targeted and unfairly punished Plaintiffs because of their sex.  The University now moves for summary judgment.

## DISCUSSION

## I.   Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A party opposing a motion for summary

15

judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256. The Court views the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).

## II.    Title IX Claim

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). For Plaintiffs' Title IX claim to survive summary judgment, Plaintiffs must set forth sufficient evidence to allow a reasonable jury to find that "the University disciplined [them] on the basis of sex—that is, because [they are] male." *Doe v. Univ. of Ark.-Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020).

The University argues that there is no indirect or direct evidence that the University disciplined Plaintiffs because they are male. In response, Plaintiffs set forth the following evidence, which they argue demonstrates sex discrimination: (1) police did not pursue criminal charges against Plaintiffs; (2) the EOAA investigator used manipulative tactics during her interviews with Plaintiffs; (3) RS helped draft the EOAA report; (4) the University only compelled males to participate in the investigation; (5) the EOAA investigator admitted to being biased; (6) the SSMS hearing was biased; (7) the University made statements that pressured the EOAA investigator and SSMS panel to punish Plaintiffs; and (8) prior failed investigations motivated the University to punish Plaintiffs.

16

Because each assertion by Plaintiffs is either conclusory or unsupported by the record, the Court concludes that no reasonable jury could find that the University disciplined Plaintiffs on the basis of sex.[8]

### A.  Criminal Proceedings and Order for Protection Hearing

Plaintiffs rely heavily on an Order for Protection ("OFP") hearing—initiated by RS against several Plaintiffs—and the police report to demonstrate that the University ignored important evidence.  The Court does not have access to the police report or the OFP hearing transcript because neither party offered it.  Even so, the record shows that the EOAA investigator attended the OFP hearing and made note of the hearing in the EOAA report.  (Report Pt. 1 at 19 n.8.)  The EOAA and SSMS panel also had access to the police report, and the Provost considered the police report during JD1's appeal.  (*Id.* at 6; Doc. No. 99-12 at 4.; Doc. No. 99-16 at 8-9.)

While Plaintiffs may argue that the EOAA, SSMS panel, and Provost did not afford proper weight to this evidence, they fail to explain how this demonstrates sex discrimination.  *See Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 926 (S.D. Iowa 2018), *aff'd*, 979 F.3d 1184 (8th Cir. 2020) (noting that conclusory allegations "about the weight of the evidence are insufficient to defeat a motion for summary judgment").

Plaintiffs appear to question whether a misconduct investigation was warranted to begin with.  JD4 testified that he felt like the police investigation exonerated him, and

---

[8]     The University additionally argues that Plaintiffs have failed to identify admissible evidence of compensable damages.  Because the Court grants summary judgment on other grounds, the Court need not address this argument.

JD5 testified that after the police investigation, "we were proven innocent." (JD4 Dep. at 108-09; JD5 Dep. at 86.) The criminal investigation, however, did not preclude the University from investigating misconduct under its Student Conduct Code. As Marisam noted, "[the University's] definition of sexual misconduct is different than the criminal definition,[9] and the evidentiary standard is different.[10]" (Marisam Dep. at 135.) Still, Plaintiffs were free to argue—and did argue—throughout the disciplinary proceedings that the criminal investigation exonerated them. Again, while Plaintiffs assert that the EOAA, SSMS panel, and Provost did not afford proper weight to the criminal investigation, they fail to explain how this is evidence of sex discrimination.

In addition to general references to the police report and OFP hearing, Plaintiffs allege that (1) RS "engaged in what was adjudicated to be consensual sex" and (2) "[i]t was quickly determined that [RS]'s allegations were untrue." (Doc. No. 104 at 4; Doc. No. 103 at 2.) Plaintiffs argue that the University was wrong to ignore this evidence; however, neither statement is supported by the record.

---

[9]     In Minnesota, criminal sexual conduct in the first, second, third, and fourth degrees requires force, coercion, or other special circumstances. *See* Minn. Stat. §§ 609.342-345. In contrast, the University has an affirmative consent policy, meaning that to participate in sexual activity, a person must receive from another "[c]lear and unambiguous words or actions . . . that a reasonable person in the circumstances would believe communicate a willingness to participate in mutually agreed upon sexual activity." (Report Pt. 1 at 5.) Moreover, the University prohibits sexual harassment, which it defines as "[u]nwelcome sexual advances, requests for sexual favors, and/or verbal or physical conduct of a sexual nature." (*Id.*)

[10]     The evidence must show "that it is more likely than not that the accused violated the subdivision(s) of the Student Conduct Code." (Doc. No. 99 at 6.)

Plaintiffs provide no citation for the assertion that RS was "engaged in what was adjudicated to be consensual sex." (Doc. No. 104 at 4.) At summary judgment, the Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In reviewing the record, the Court finds no evidence to support this statement. While the record shows that the Hennepin County Attorney's Office declined to pursue criminal charges against Plaintiffs, that is certainly not evidence of a judicial adjudication or that Plaintiffs "were proven innocent."[11]

Plaintiffs' assertion that "[i]t was quickly determined that [RS]'s allegations were untrue" (Doc. No. 103 at 2) is also unsupported by the record. Plaintiffs cite to testimony in which Marisam said that more students may have been involved in the sexual assault, but she did not have enough evidence to make a formal determination. (Marisam Dep. at 66-67.) This testimony does not support Plaintiffs' conclusion that RS was untruthful. Plaintiffs also cite to an excerpt of RS's general recollection within the EOAA report, but the excerpt makes no determination of the veracity of RS's statements. (Report Pt. 1 at 9-10.) Lastly, Plaintiffs cite to exhibit 86, which does not exist in the record. Without evidence, Plaintiffs' assertion is merely conclusory. Moreover, to the extent that Plaintiffs argue that specific statements in the police report or OFP hearing prove that they did not violate the University's Student Conduct Code, the Court has no way of

---

[11]   The Court recognizes that there are many factors that go into a determination not to file charges in any given case, and the Court cannot and will not speculate as to why charges were not filed here.

verifying such allegations because the police report and OFP hearing transcript are not part of the record.

### B.    EOAA Investigation

Plaintiffs next argue that Marisam "us[ed] false narratives and other manipulative tactics" during her interviews with Plaintiffs.  (Doc. No. 104 at 9.)  Again, Plaintiffs provide no evidence to support this argument, and in reviewing the record, the Court finds little evidence that could even arguably support this claim.  While some Plaintiffs testified that they felt negatively about their interviews with Marisam—for instance, JD6 and JD8 both testified that they felt that Marisam "had a vendetta" against the football team, and JD4 testified that he did not like Marisam's "tone" (JD6 Dep. at 72; JD8 Dep. at 96; JD4 Dep. at 117)—Plaintiffs cannot rely on their subjective feelings about the interviews to prove sex discrimination.

"[C]learly irregular investigative and adjudicative processes" can constitute evidence of sex discrimination.  *Rossley v. Drake Univ.*, 979 F.3d 1184, 1196 (8th Cir. 2020).  JD11 said that Marisam used leading questions during his interview, but this strikes the Court as a normal interrogation practice.  (JD11 Dep. at 79.)  In addition, JD4 said that Marisam "just kind of like tried to trick me all the time."  (JD4 Dep. at 48.)  Again, this is not by itself improper, and JD4 later acknowledged that the facts in the EOAA report were generally consistent with what he told Marisam during his interview.  (*Id.* at 119-21.)  Other students also stated that the report accurately described their

version of the facts.  (JD2 Dep. at 94-99; JD5 Dep. at 134-35; Doc. No. 95-13 ("JD10 Dep.") at 93.)[12]

In addition, several Plaintiffs reported positive opinions of their interview with Marisam.  JD2 testified that Marisam "let [him] answer [the] questions fully" and that "it felt like she was trying to get [his] side."  (JD2 Dep. at 87-88.)  And JD6 testified that Marisam treated him fairly.  (JD6 Dep. at 74-75.)  Without more, the Court cannot reasonably infer that Marisam's interviews with Plaintiffs were "clearly irregular."  *See Rossley*, 979 F.3d at 1196.

Finally, while Plaintiffs take issue with the fact that Marisam met with RS six times and only met with each Plaintiff once, no Plaintiff requested a second interview.  Nor did any Plaintiff indicate that they had more to say to Marisam.  The Court cannot reasonably infer that this is evidence of sex discrimination.

### C.   EOAA Report

Plaintiffs claim that RS "actively participate[d]" in drafting the EOAA report and "select[ed] what information would be included" in the report.  (Doc. No. 104 at 15; Doc. No. 103 at 5.)  In support, Plaintiffs provide evidence that RS did not give her sexual assault exam to the EOAA.

---

[12]   In contrast, JD11 claimed that Marisam lied throughout the report about his interview with her.  The SSMS panel considered his testimony and found that his responses during the EOAA meeting "were more credible than the responses [he] provided during the hearing."  (Doc. No. 99-13 at 5.)

Marisam testified that it was "not unusual [for] complainants [to] decline to provide this kind of [medical] information." (Marisam Dep. at 156.) Marisam noted in the report that the "EOAA requested the results of RS['s] forensic examination, but RS did not provide EOAA with these results." (Report Pt. 1 at 17.) Plaintiffs were aware of the sexual assault exam and were free to argue during the hearing that this fact damaged RS's credibility. The evidence, however, does not support Plaintiffs' assertion that RS actively participated in drafting the EOAA report. And the Court cannot reasonably infer that RS's decision to withhold her sexual assault exam from the University is evidence that the University disciplined Plaintiffs on the basis of sex.

### D. Female Student-Athlete

Plaintiffs next argue that Marisam only compelled men to interview with her. Specifically, Plaintiffs contend that Marisam knew that W17 was in the apartment with JD10 on the night of the alleged assault, and Marisam "refused to interview the female." (Doc. No. 104 at 4; *see also* Doc. No. 103 at 2 n.1.) Because W17 could have been involved in the crowd that RS reported had gathered around the bedroom door, Plaintiffs argue that it was discriminatory for Marisam not to interview W17.

There is no evidence that Marisam refused to interview W17, and Plaintiffs cite no evidence to support this conclusion. The record instead shows that Marisam emailed W17 two times requesting an interview, but W17 did not respond.[13] (Report Pt. 2 at 39.)

---

[13]     JD7 said that W17 did not want to get involved in the investigation because of "later found intimidation tactics that were used by EOAA and the [U]niversity." (JD7 Dep. at 129.) But Plaintiffs provide no evidence to support this allegation.

Marisam testified that she did not require W17 to interview with her because W17 was only a witness, and she did not believe that she had the authority to compel witnesses to speak with her.  (Marisam Dep. at 115.)  While initially it was unclear to Marisam who was a witness and who was a potential respondent, RS consistently reported that only men were involved in the sexual assault and harassment.  (*See id.* at 119; Report Pt. 1 at 7-19.)  Thus, Marisam never considered W17 to be a potential respondent.

Moreover, Marisam testified that by the time she discovered that W17 had been in the apartment, "there had been a lot of evidence gathered, and there had been no evidence gathered that led [her] to believe that anyone other than men were involved in sexual contact with [RS]."  (Marisam Dep. at 119.)  Plaintiffs' testimony supports Marisam's assessment.  JD1, JD2, JD6, JD7, and JD8 each said that they did not see W17 that night.  (JD1 Dep. at 71; JD2 Dep. at 64; JD6 Dep. at 53; JD7 Dep. at 126-27; JD8 Dep. at 74.)  No one alleged that W17 was in any way involved in the assault or harassment, and JD10 did not even mention W17 during his interview with Marisam.  (*See* Report Pt. 2 at 38; Marisam Dep. at 100.)  While Plaintiffs take issue with the fact that only men in the apartment that night were considered potential respondents, "the University is not responsible for the gender makeup of those who are accused *by other students* of sexual misconduct" and RS never accused W17—or any female—of taking part in the sexual assault or harassment.  *See Doe v. Univ. of Colo.*, 255 F. Supp. 3d 1064, 1078 (D. Colo. 2017) (internal quotations and citation omitted).

Despite W17's decision to not meet with Marisam, Plaintiffs obtained an affidavit from her that was considered by the SSMS panel.  (*See* Doc. No. 99-5.)  Plaintiffs argue

that W17 "saw [RS] when she entered the room and when she left the apartment."  (Doc.

No. 104 at 4.)  That is false.  The affidavit does not mention RS at all.  Rather, W17

stated that between 2:45 a.m. and 3:48 a.m., she spent fifteen to twenty minutes in the

bathroom and the rest of the time in JD10's bedroom.  (Doc. No. 99-5 ¶¶ 5-6.)  She also

indicated that she did not hear or see anything unusual.  (*Id.* ¶ 7.)  All of this information

was available to the SSMS panel.  And on appeal, the Provost found that this information

contradicted JD10's testimony and was unrelated to JD1's misconduct.  (Doc. No. 99-17

at 6; Doc. No. 99-16 at 9.)

Plaintiffs additionally argue that "male witnesses were systematically threatened

and coerced" and that Marisam "extort[ed] male witnesses."  (Doc. No. 103 at 10; Doc.

No. 104 at 15.)  Plaintiffs go so far as to argue that the athletic department threatened that

Plaintiffs would "not eat or practice" and would "loose [sic] their scholarship" if they

failed to meet with Marisam.  (Doc. No. 104 at 9.)

Plaintiffs' testimony tells a different story.  JD1 said that he thought he "met with

the EOAA office independently without having to be instructed."  (JD1 Dep. at 131.)

When asked if the coaches threatened punishment, JD4 said, "I mean, it was just

assumed, like, if you don't show up, they're going to think that you're guilty."  (JD4 Dep.

at 107.)  JD8 stated that Coach Claeys told him to check his email and that "it would be

best for us to do the interview."  (JD8 Dep. at 57.)  And JD11 stated, "I remember our

coach saying that we had to do it."  (JD11 Dep. at 76.)

While Plaintiffs may have been required to attend the interviews with Marisam,

and the athletic department facilitated scheduling those interviews, there is no evidence

that the athletic department coerced Plaintiffs or threatened to withhold food if Plaintiffs failed to meet with the EOAA.  As Marisam indicated, the EOAA did not know who would be a respondent in the case.  (Marisam Dep. at 57-58.)  The EOAA wanted to provide Plaintiffs with the opportunity to hear the allegations and to "bring an advisor, an advocate[,] or an attorney to the meeting," which is the right of a respondent.  (*Id.*)  Based upon the record, the Court cannot reasonably infer that this is evidence of sex discrimination.

### E.    Unconscious Bias

Next, Plaintiffs argue that Marisam "admis [sic] that she is biased against black males" and failed to take remedial measures.[14]  (Doc. No. 104 at 9.)  As the University notes, Marisam testified that she was "not aware of implicit bias that [she] ha[s] toward black men."  (Marisam Dep. at 177.)  When asked about the possibility of unconscious bias, Marisam acknowledged that everyone may have unconscious bias, including herself.  (*Id.*)  Plaintiffs, however, fail to connect this testimony to Marisam's actions in this case.  Additionally, the University had remedial measures in place—Marisam participated in trainings and discussed EOAA practices designed to mitigate the impact of unconscious bias.  (*Id.* at 178-80.)  The Court cannot reasonably infer from this information that Marisam discriminated against Plaintiffs on basis of sex.

---

[14]    Plaintiffs suggest that Marisam was biased against them based on their sex and their race.  Because Plaintiffs' race discrimination claims have been dismissed, the Court only considers Plaintiffs' allegations of sex discrimination.

F.      SSMS Panel

Plaintiffs additionally contend that because the EOAA provides training for the

SSMS members, the panel likely found Marisam and the EOAA report to be more

credible than Plaintiffs' testimony.  The EOAA provides annual training to SSMS

members on sexual misconduct and sexual harassment.  (*Id.* at 48.)  There is no evidence,

however, that SSMS members were instructed to give special weight to the EOAA or to

defer to the EOAA's determinations.  Rather, SSMS panels are instructed to review cases

*de novo*.  (*Id.* at 220; *see* Doc. No. 99 at 7.)  Here, the panel's review led to separate

findings for each Plaintiff, over half of which were reduced from the EOAA report's

recommended sanction.

Additionally, there is no evidence that this method of training was outside of the

University's common practice.  The SSMS chair stated that the "SSMS members are

required to attend 10 hours of training before serving on a SSMS panel" and both the

Office for Community Standards and the EOAA provide some of the training.  (Renner

Decl. ¶ 9.)  While Plaintiffs take issue with the fact that the EOAA—and thus, to an

extent, Marisam—participated in training SSMS members, the record does not

demonstrate that this was a deviation from the University's procedures, designed to

discriminate against Plaintiffs.  *See Doe v. Univ. of S. Ind.*, 43 F.4th 784, 793 (7th Cir.

2022) (concluding that procedural errors can support an inference of sex discrimination

when a defendant deviates from proper procedures "not because of human error but by

design, to . . . discriminate against the plaintiff on the basis of his sex").  Nor can the

Court conclude based on this information that the SSMS panel's findings are "so devoid of substantive content as to be unworthy of credence." *Rossley*, 979 F.3d at 1193.

Plaintiffs take issue with other aspects of the SSMS hearing. Plaintiffs argue that RS was represented by the University. Plaintiffs provide no evidence for this assertion, and in examining the record, the Court found that RS had her own attorney. (*See* Doc. No. 100-3 at 44.) Plaintiffs also assert that "taxpayer dollars hired experts in [RS's] case." (Doc. No. 104 at 12.) Again, Plaintiffs provide no support for this assertion.

Additionally, Plaintiffs argue that the hearing was discriminatory because RS had three hours "to present her case" while Plaintiffs each had between twenty and thirty minutes "to present there [sic] case." (*Id.* at 11.) As an initial matter, RS was not "presenting" a case. While RS was represented by counsel at the hearing, her counsel was not presenting a case to the panel nor did her counsel examine witnesses. Only the University and Plaintiffs presented cases.

The SSMS Chair allocated six hours and fifty-five minutes for the University to present its case and six hours and forty-five minutes for Plaintiffs' counsel to present their cases. (Doc. No. 99-1 at 6-8.) The Court cannot reasonably infer that this decision was based on Plaintiffs' sex. And significantly, while some Plaintiffs took issue with the amount of time RS spoke at the hearing, Plaintiffs do not argue that they needed more time to fully present their cases.

Plaintiffs next assert, without citing to the record, that Marisam did not attend the second day of the SSMS hearing "because she was 'too drunk' to attend." (Doc. No. 104 at 12.) Upon further investigation, the Court finds no evidence that Marisam said she

was "too drunk" to testify.  Rather, Marisam stated that the day after she testified, she was unexpectedly called in to answer follow-up questions.  She said, "[A]t that time we had gotten the kids to bed, and my husband and I were sitting on the couch, and I had a few glasses of wine . . . I did not think it was a good idea for me to come and testify to this important matter after I'd had a few glasses of wine."  (Marisam Dep. at 36-37.) While Plaintiffs argue that Marisam "just disappeared" and "refused to . . . be cross examined about her report" (Doc. No. 104 at 12), the record shows otherwise.  Plaintiffs cross-examined Marisam on the first day of the SSMS hearing.  (*See, e.g.*, Doc. No. 99-6 at 4.)  Although Marisam did not attend the hearing the second night, there is no evidence that Marisam's failure to appear was based on gender bias or intended to prejudice Plaintiffs.

Plaintiffs' themselves have mixed views about the SSMS panel.  Several Plaintiffs testified that the SSMS panel was fair.  (*See* JD2 Dep. at 113; JD8 Dep. at 84; JD9 Dep. at 99-100; JD11 Dep. at 124.)  Others took issue with the SSMS panel's regular procedures.  For example, JD4 said that he did not think women could serve on the panel because he did not think at the time that "they had the capability of being [un]biased in the case."  (JD4 Dep. at 137.)  JD1 said that he did not think "it was a matter that should have been heard at the university level."  (JD1 Dep. at 150.)  And JD5 felt that the process was unfair because the police investigation was over, and the University chose to "re-bring it up."  (JD5 Dep. at 143.)  These objections are based on the University's normal disciplinary practices and procedures, from which the University did not deviate.

The Court cannot reasonably infer from this testimony that the SSMS panel was biased or punished Plaintiffs on the basis of sex.

### G.     University Statements

Plaintiffs next assert that the University's Athletic Director, Mark Coyle, admitted to suspending the players for "optics." (Doc. No. 103 at 2; Doc. No. 104 at 5.) Plaintiffs refer to notes of a phone conversation between the Director of the EOAA, Kim Hewitt, and the Spirit Squad Coach, Sam Owens, where Hewitt wrote the following: "Mark Coyle said that they can suspend one player. He recommends keep the other four suspended because of optics. When he interviewed her she gave consent to three players . . . He will be done with the investigation . . . Wednesday . . . He collected their DNA and wants to run a couple of tests." (Doc. No. 100 at 3.) The call occurred two weeks before RS contacted the EOAA to make a report. (*Id.*)

There is no evidence that Coyle ever interviewed RS, conducted an investigation, or collected DNA. Coyle testified that he believed the statement was wrongfully attributed to him, because he was not at all involved in the criminal investigation. (Doc. No. 97-9 ("Coyle Dep.") at 149-52.) Moreover, Coyle denied stating that only one student could be suspended, as it was common practice to suspend all students involved in a criminal investigation. (*Id.* at 25, 54-55.) During discovery, Plaintiffs gathered no additional evidence to provide context to Hewitt's notes—for instance, Plaintiffs did not depose Hewitt or Owens. Without more, the Court cannot reasonably infer that Coyle made the "optics" statement.

Plaintiffs next argue that statements made by President Kaler influenced the disciplinary proceedings.  Plaintiffs assert that "[l]ike Donald Trumps' [sic] DOJ investigation into his alleged efforts to rally a mob of illegal no-gooders, Kahler [sic] with the help of [University] public relations teams made several comments in the press that []sex assault education 'didn't seem to make the point.'"  (Doc No. 104 at 11.) Plaintiffs cite to "Pioneer Press dated January 13, 2017." (*Id.*)  The article is not in the record and thus the Court cannot verify these statements.

The only statement in the record is a statement President Kaler made in December 2016 about a football boycott.  (*See* Doc. No. 100-4.)  Kaler said that "[w]hile the 10 players are suspended from active participation in the football program, they remain members of the team and students of the University of Minnesota." (*Id.* at 4.)  Kaler noted that the suspension of the players prior to the hearing "was a values-based decision by the Athletics Department and not a legal judgment." (*Id.* at 5.)

While Plaintiffs argue that "[c]ontinued press by the President" influenced the SSMS hearing (Doc. No. 104 at 11), the Court does not have access to any of the alleged press that Plaintiffs reference.  At this stage of the proceedings, Plaintiffs cannot merely rely on allegations in their complaint and instead must "cit[e] to particular parts of materials in the record."  Fed. R. Civ. Pro. 56(c)(1)(A).  Here, they have failed to do so. The only article in the record is President Kaler's December 2016 statement and, as noted above, the Court cannot reasonably infer that this statement influenced the disciplinary proceedings.

## H.    Prior Investigations

Additionally, Plaintiffs contend that due to prior University investigations involving football players, the EOAA had developed "preconceived conclusions" that the football players were violent.  (Doc. No. 104 at 8.)  Plaintiffs reference a 2015 email from Hewitt to then-Athletics Director Norwood Teague and then-Deputy Athletics Director Beth Goetz, which Plaintiffs argue contained unwarranted conclusions about the football team.

The email stated that "this year," the EOAA received "2 concerns of sexual assault committed by individual football players, 2 concerns of sexual harassment involving groups of football players, [and] 1 concern of retaliation involving a group of football players."  (Doc. No. 99-19 at 2.)  Hewitt noted that one of the sexual harassment complaints, and both sexual assault complaints, were not investigated because "the reporting students did not want to go forward with an investigation."  (*Id.*)  The other sexual harassment complaint resulted in a finding that one football player violated the sexual harassment policy.  (*Id.*)  Additionally, the EOAA found concerning behavior during the investigation of the retaliation but did not have enough evidence to make a finding that the players violated University policy.  (*Id.*)  Based on the "notable number of Title IX-related concerns" that the EOAA had received involving football players, the EOAA found that the reports "demonstrate[d] a concerning pattern of football player conduct" that warranted action.  (*Id.*)

President Kaler was not included in this email.  (*See id.*)  And contrary to Plaintiffs' assertion, the email did not allege that "future sexual violence and harassment

of women on campus" by football players was inevitable.  (Doc. No. 104 at 8.)  The
email itself was gender neutral.  The EOAA noted that the "University's responsibility to
act is greater when circumstances suggest that there is an increased risk of future acts of
sexual violence or harassment by a particular group or where there is a potentially
concerning pattern."  (Doc. No. 99-19 at 2.)  Because there was a potential pattern, given
the five prior complaints involving football players, the EOAA suggested that they meet
with the Athletic Director to discuss responsive action.  This is not evidence of sex
discrimination.

## I.     Other Assertions

Lastly, Plaintiffs make a number of conclusory allegations that the Court will not
consider.  For instance, Plaintiffs argue that the EOAA report "systematically excluded
exculpatory information about the men."  (Doc. No. 103 at 2.)  Plaintiffs do not explain
what exculpatory evidence was excluded nor do they provide any evidence that this
occurred.  Plaintiffs also argue that Kaler "refused to appear for his deposition."  (Doc.
No. 104 at 1 n.2.)  Again, Plaintiffs make this allegation without providing evidence.
Finally, Plaintiffs argue that "the vast majority of reporting students are female[,] and the
vast majority of accused are male," which they assert is evidence of sex discrimination.
(Doc. No. 103 at 5.)  The parties have not provided the Court with data about the number
of sexual misconduct investigations at the University or the gender of the accused and
reporting students.  But "even assuming that all of the [University's sexual misconduct]

cases involved males, the data does not demonstrate gender bias." *Rossley*, 979 F.3d at 1195.[15]

While Plaintiffs' make numerous allegations of sex discrimination, they have failed to put forth sufficient evidence to support these allegations. At summary judgment, Plaintiffs cannot rely on "[m]ere allegations, unsupported by specific facts or evidence beyond [their] own conclusion[s]." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). Here, Plaintiffs have not provided the Court with specific evidence, establishing a disputed issue of material fact. Because there is no genuine dispute of material fact, no reasonable jury could find for Plaintiffs. For that reason, the Court grants summary judgment.

## CONCLUSION

Because Plaintiffs have failed to put forth sufficient evidence of sex discrimination, the Court grants the University's motion for summary judgment.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendant's motion for summary judgment (Doc. No. [89]) is **GRANTED**.

---

[15]      As a final matter, the Court feels obligated to note that Plaintiffs' briefs consistently fail to cite to the record, as required by Rule 56 of the Federal Rules of Civil Procedure. Moreover, there are numerous instances where Plaintiffs misstate the record and misquote the parties. Such errors by counsel encumber the Court's time and resources and ill serve their clients.

2.      Plaintiffs' Title IX claim against Defendant is **DISMISSED WITH**

**PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  January 26, 2023                          s/Donovan W. Frank
                                                  DONOVAN W. FRANK
                                                  United States District Judge